[L.A. No. 30398. Oct. 4, 1977.]

JOHN SERRANO, JR., et al., Plaintiffs and Appellants, v.
IVY BAKER PRIEST,* as State Treasurer, etc., et al.,
Defendants and Appellants.

*Although the former state Treasurer (now deceased) is not a party to this appeal, we continue to use the title *Serrano* v. *Priest* for purposes of consistency and convenience.

**COUNSEL**

Sidney M. Wolinsky, Daniel M. Luevano, Rosalyn Chapman, Philip E. Goar, John E. McDermott, Rose Matsui Ochi, David A. Binder, Harold W. Horowitz, Jerome L. Levine, Michael H. Shapiro, E. Robert Wallach, Richard A. Rothschild, Mary S. Burdick and Diane Messer for Plaintiffs and Appellants.

Bayard F. Berman, William T. Rintala, Henry Shields, Robert G. Sproul, Jr., James J. Brosnahan, Jr., Edward W. Rosston, David M. Heilbron, Stuart C. Walker, Robert E. Cartwright, Edward I. Pollock, Arne Werchick, Sanford M. Gage, Leroy Hersh, Ned Good, David B. Baum, Robert G. Beloud, Roger H. Hedrick, Leonard Sacks, Stephen I. Zetterberg, Antonio Rossmann, Carlyle W. Hall, Jr., Brent N. Rushforth and John R. Phillips as Amici Curiae on behalf of Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, N. Eugene Hill, Assistant Attorney General, John J. Klee, Jr., Ronald V. Thunen, Jr., Thomas E. Warriner and Richard M. Skinner, Deputy Attorneys General, for Defendants and Appellants.

## Opinion

**SULLIVAN, J.\***—In *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929] (hereafter cited as *Serrano II*) we affirmed a judgment of the Los Angeles County Superior Court, entered on September 3, 1974, which held essentially (1) that the then-existing California public school financing system was invalid as in violation of state constitutional provisions guaranteeing equal protection of the laws, and (2) that the said system must be brought into constitutional compliance within a period of six years from the date of entry of judgment, the trial court retaining jurisdiction for the purpose of granting any necessary future relief.[1] That judgment is now final.

Within a month after the entry of the foregoing judgment and prior to the filing of defendants' appeals, plaintiffs' attorneys (Public Advocates, Inc. and Western Center on Law and Poverty) made separate motions for an award of reasonable attorneys fees "against defendants Priest [then the state Treasurer], Riles [then and presently the state Superintendent of Public Instruction] and Flournoy [then the state Controller] in their official capacities as officials of the State of California." The motions were not based upon statute but were instead addressed to the equitable powers of the court. Three theories, to be examined in detail by us below, were advanced in support of the award: the so-called "common

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1]A more complete summary of the trial court judgment was set forth in *Serrano II*: "The trial court held that the California public school financing system for elementary and secondary schools as it stood following the adoption of S.B. 90 and A.B. 1267, while not in violation of the equal protection clause of the Fourteenth Amendment to the federal Constitution, was invalid as in violation of former article I, sections 11 and 21, of the California Constitution (now art. IV, § 16 and art. I, § 7 respectively . . .), our state equal protection provisions. Indicating the respects in which the system before it was violative of our state constitutional standard, the court set a period of six years from the date of entry of judgment as a reasonable time for bringing the system into constitutional compliance; it further held and ordered that the existing system should continue to operate until such compliance had been achieved. The judgment specifically provided that it was not to be construed to require the adoption of any particular system of school finance, but only to require that the plan adopted comport with the requirements of state equal protection provisions. Finally, the trial court retained jurisdiction of the action and over the parties 'so that any of such parties may apply for appropriate relief in the event that relevant circumstances develop, such as a failure by the legislative and executive branches of the state government to take the necessary steps to design, enact into law, and place into operation, within a reasonable time from the date of entry of this Judgment, a California Public School Financing System for public elementary and secondary schools that will fully comply with the said equal-protection-of-the-law provisions of the California Constitution.' " (*Serrano II* at pp. 748-750.)

fund" theory, the "substantial benefit" theory, and the "private attorney general" theory.

. A hearing on the issue of entitlement to fees was held on January 6, 1975, and on January 27 the trial court entered an interim order in which it announced its intention to award reasonable attorneys fees to plaintiffs' counsel on the private attorney general theory only, declining to apply the other two theories advanced. The matter was continued until April 14, 1975, for briefing and argument upon the issue of the amount of fees to be awarded. On that date the court received testimony and, upon stipulation of the parties, additional evidence by affidavit. At the conclusion of this hearing the court announced its intention to award $400,000 as reasonable attorneys fees to Public Advocates, Inc. and $400,000 as reasonable attorneys fees to Western Center on Law and Poverty. Upon timely request by Public Advocates, Inc. the court ordered the preparation of findings of fact and conclusions of law. On August 1, 1975, the court filed its "Order Concerning Attorneys' Fees," which was consistent in all relevant respects with its previous rulings,[2] as well as its "Findings of Fact and Conclusions of Law Concerning the Award of Attorneys' Fees"—of which there were 219 of the former and 28 of the latter.

Two notices of appeal from the order were filed, one by Public Advocates, Inc. and Western Center on Law and Poverty, as "counsel for plaintiffs," and one by defendants Unruh, Cory, and Riles. On October 1, 1975, we transferred the appeal to this court and ordered it consolidated with the then-pending appeal in *Serrano II.* The latter appeal having been fully briefed, however, we proceeded to hear argument and render our decision in *Serrano II,* deferring our consideration of the instant appeal until the judgment in *Serrano II* had become final.

On January 28, 1977, after the rendition of our decision in *Serrano II* but prior to the issuance of the remittitur, a motion was filed in this court

---

[2]The order provided in relevant part: IT IS HEREBY ORDERED that Public Advocates, Inc. and Western Center on Law and Poverty, attorneys for Plaintiffs, are each entitled under the private attorney general doctrine to receive reasonable attorneys' fees from the defendants, Jesse M. Unruh [present state Treasurer], Kenneth Cory [present state Controller], and Wilson C. Riles, *in their representative capacities.* [¶] IT IS FURTHER ORDERED that $400,000 is a reasonable attorneys' fee for the representation by Public Advocates, Inc. of the plaintiffs from the beginning of the instant action through April 14, 1975. [¶] IT IS FURTHER ORDERED that $400,000 is a reasonable attorneys' fee for the representation by Western Center on Law and Poverty of the plaintiffs from the beginning of the instant action through April 14, 1975."

for reasonable attorneys' fees in connection with the appeal of this cause. This motion was filed by "respondents" (designated in the caption as plaintiffs John Serrano, Jr. et al.) by their attorneys, Public Advocates, Inc. and Western Center on Law and Poverty. Prior to issuance of the *Serrano II* remittitur we modified our judgment to reserve jurisdiction for the purpose of passing upon this motion in conjunction with the instant appeal.

## I

We summarize the contentions advanced in the briefs of the parties:[3]

Defendants contend that the award of attorneys fees was improper on any of the grounds considered. Thus, they urge that whereas the trial court was correct in determining that such an award cannot be sustained on either the common fund theory or the substantial benefit theory, it erred in concluding that an award should be made on the private attorney general theory. Additionally they argue that even if such an award based on any of these theories were proper in a case in which the prevailing litigant had incurred an obligation to pay for legal services, it could not be justified in a case in which, as here, the plaintiffs had incurred no obligation for such services which were provided without charge by organizations receiving public or tax-exempt charitable funding.[4] In any event, defendants urge, the award in this case is excessive. Finally, defendants also oppose the granting of the motion for attorneys fees on appeal.

Plaintiffs and their attorneys, while agreeing with the trial court's award of fees on the private attorney general theory, contend that the court erred in refusing to base its award additionally on the common fund and substantial benefit theories. The fact that plaintiffs are represented by organizations receiving public or other tax-exempt funding, they urge, should have no effect upon their eligibility for the

---

[3]In addition to the briefs of the parties, briefs amicus curiae have been filed by the Bar Association of San Francisco and the San Francisco Lawyers' Committee for Urban Affairs (joint brief); the Los Angeles County Bar Association; the Woodland Hills Residents Association; Robert E. Cartwright, Edward I. Pollock, Arne Werchick, Sanford M. Gage, Leroy Hersh, Ned Good, David B. Baum, Robert G. Beloud, Roger H. Hedrick, Leonard Sacks and Stephen I. Zetterberg (joint brief); and Center for Law in the Public Interest.

[4]Public Advocates, Inc. is a nonprofit legal corporation supported by tax-exempt charitable funds. Western Center on Law and Poverty is a public interest law center funded by the Legal Services Corporation. (See 42 U.S.C. § 2996 et seq.) Neither may accept fees from clients.

award. Public Advocates, Inc., in an argument in which Western Center on Law and Poverty does not join, also urges that the award is inadequate. Finally, plaintiffs and their attorneys contend that their motion for attorneys fees on appeal should be granted on each of the three theories here in question.

## II

Recently in *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], we had occasion to point out: "Section 1021 of the Code of Civil Procedure provides in relevant part: 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . .' No state statute provides for the award of attorney's fees in a case of this nature, and there has been no express or implied agreement concerning attorney's fees in this case. However, appellate decisions in this state have created two nonstatutory exceptions to the general rule of section 1021, each of which is based upon inherent equitable powers of the court. The first of these is the well-established 'common fund' principle: when a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund. (See, e.g., *Estate of Stauffer* (1959) 53 Cal.2d 124, 132 [346 P.2d 748]; *Estate of Reade* (1948) 31 Cal.2d 669, 671-672 [191 P.2d 745]; see generally 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, §§ 129-133, pp. 3278-3283.) The second principle, of more recent development, is the so-called 'substantial benefit' rule: when a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees. (See, e.g., *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 203-204 [81 Cal.Rptr. 683]; *Fletcher* v. *A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 318-325 [72 Cal.Rptr. 146]; see also *Sprague* v. *Ticonic Bank* (1939) 307 U.S. 161 [83 L.Ed. 1184, 59 S.Ct. 777]; see generally 4 Witkin, Cal. Procedure, *supra,* Judgment, § 134, pp. 3283-3284.)" (*Id.,* at p. 25.) Mindful of these observations, we proceed first to determine whether the trial court was correct in concluding that an award of reasonable attorneys fees could not be supported in the instant case under either of the aforementioned exceptions to the rule of section 1021.

(a) *The Common Fund Theory*

■ "Although American courts, in contrast to those of England, have never awarded counsels' fees as a routine component of costs, at least one exception to this rule has become as well established as the rule itself: that one who expends attorneys' fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair share of the litigation costs." (*Quinn* v. *State of California* (1975) 15 Cal.3d 162, 167 [124 Cal.Rptr. 1, 539 P.2d 761]; fns. omitted.) This, the so-called "common fund" exception to the American rule regarding the award of attorneys fees (i.e., the rule set forth in section 1021 of our Code of Civil Procedure), is grounded in "the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund of property itself or directly from the other parties enjoying the benefit." (*Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240, 257 [44 L.Ed.2d 141, 153, 95 S.Ct. 1612]; fn. omitted.)

First approved by this court in the early case of *Fox* v. *Hale & Norcross S. M. Co.* (1895) 108 Cal. 475 [41 P. 328], the "common fund" exception has since been applied by the courts of this state in numerous cases. (See, e.g., *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 341, fn. 19 [124 Cal.Rptr. 513, 540 P.2d 609]; *Estate of Reade, supra,* 31 Cal.2d 669, 671-672; *Winslow* v. *Harold G. Ferguson Corp.* (1944) 25 Cal.2d 274, 277 [153 P.2d 714]; *Farmers etc. Nat. Bank* v. *Peterson* (1936) 5 Cal.2d 601, 607 [55 P.2d 867]; *Estate of Kann* (1967) 253 Cal.App.2d 212, 223 [61 Cal.Rptr. 122]; see generally Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds* (1974) 87 Harv.L.Rev. 1597.) In all of these cases, however, the activities of the party awarded fees have resulted in the preservation or recovery of a certain or easily calculable sum of money—out of which sum or "fund" the fees are to be paid.[5] We can find no such "fund" in this case.

■ In relevant findings of fact the trial court found that plaintiffs "have proven that the sum of money available for public education in California is not being spent in accordance with the California Constitu-

---

[5]"Fees are awarded under this rationale out of a fund recovered or maintained by the plaintiff, on the theory that all who will participate in the fund should pay the cost of its creation or protection and that this is best achieved by taxing the fund itself for attorney's fees." (Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts* (1974) 122 U.Pa.L.Rev. 636, 694-695 [cited hereafter as Comment, *Equal Access*].)

tion" and "have protected the sum of money available for public education" in the state. Plaintiff urges that these findings are tantamount to a determination that a fund of money for educational use was created by their efforts. The trial court, however, concluded otherwise, reasoning that whatever additional monies are made available for public education as a result of the *Serrano* judgment will flow from legislative implementation of the judgment, not from the judgment itself. That judgment requires substantial equality in educational opportunity for the school children of this state without regard to the taxable wealth per student in the particular district in which a student lives. It does not require any particular level of expenditure.[6] Accordingly, it cannot be said that the efforts of plaintiffs have created or preserved any "fund" of money to which they should be allowed recourse for their fees.

Plaintiffs place great emphasis on the trial court's finding that under the 1972 and 1973 legislation which we have referred to in our *Serrano II* opinion as "S.B. 90 and A.B. 1267" (see *Serrano II* at pp. 736-737, 741-744), passed in response to our decision in *Serrano I,* an annual pool of some $550 million has come into existence for purposes of education and property tax relief. Moreover, they point out, it is quite likely that under subsequent legislation substantial further sums of money will become available for these purposes. Again, however, we point out that any such increases in the total educational budget, while they may be termed a *"response"* to our *Serrano* decisions, are by no means *required* by them. It is for the Legislature to determine, in its conjoined political wisdom, whether the achievement of that degree of equality of educational opportunity which is required by the state Constitution is to be accompanied by an overall increase in educational funding.

---

[6]In footnote 28 of our *Serrano II* opinion we quoted the following passage from the trial court's memorandum opinion: "What the *Serrano* [I] court imposed as a California constitutional requirement is that there must be uniformity of treatment between the children of the various school districts in the State because all the children of the State in public schools are persons similarly circumscribed. The equal-protection-of-the-laws provisions of the California Constitution mandate nothing less than that all such persons shall be treated alike. If such uniformity of treatment were to result in all children being provided a low-quality educational program, or even a clearly *inadequate* educational program, the California Constitution would be satisfied. This court does not read the *Serrano* [I] opinion as requiring that there is any constitutional mandate for the State to provide funds for each child in the State at some magic level to produce either an adequate-quality educational program or a high-quality educational program. It is only a disparity in treatment between equals which runs afoul of the California constitutional mandate of equal protection of the laws." As our opinion in *Serrano II* makes clear, this is a correct characterization.

Finally, even if it were determined that the monies to become available for education in the wake of *Serrano* should be considered a "fund" for these purposes, plaintiffs and their attorneys nowhere suggest that payment should be made to them out of such monies.[7] Instead they seem to indicate, with perhaps intentional vagueness, that their fees should be paid by "the State." Apparently their primary authority in this respect is the case of *Brewer* v. *School Board of City of Norfolk, Virginia* (4th Cir. 1972) 456 F.2d 943 (cert. den. (1972) 406 U.S. 933 [32 L.Ed.2d 136, 92 S.Ct. 1778]), in which the Court of Appeals ordered the award of reasonable attorneys fees against a school district after determining that its desegregation plan was inadequate insofar as it failed to provide a practical method of free transportation for students assigned to schools beyond normal walking distance from their homes. There the court, stating that this was a case for "at least a quasi-application of the 'common fund' doctrine" (456 F.2d at p. 951), reasoned that whereas each of the students involved had secured a right worth approximately $60 per year to each of them, it would "defeat the basic purpose of the relief provided" to impose a charge against them for a proportionate share of the attorneys fees (*id.,* at p. 952). "The only feasible solution in this particular situation," the court held, "would seem to be in requiring the school district itself to supplement its provision of free transportation with payment of an appropriate attorney's fee to plaintiffs' attorneys for securing the addition of such a provision to the plan of desegregation." *(Id.)*

We, along with the concurring judge in *Brewer* (Winter, Cir. J., conc. specially, 456 F.2d at pp. 952-954), are of the view that the *Brewer* case, to the extent that it relies upon the terminology used, represents an improper application of the "common fund" theory. (See also Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation* (1975) 88 Harv.L.Rev. 849, 895-896; Comment, *Equal Access, supra,* 122 U.Pa.L. Rev. 636, 695-696.) In any event it is not consistent with the law of this state. We hold that here, where plaintiffs' efforts have not effected the creation or preservation of an identifiable "fund" of money out of which

---

[7]Such an award, of course, would necessarily bring about a diminution in educational funding, a result which plaintiffs and their attorneys might be presumed to oppose. Moreover, an award of this kind would essentially constitute the acceptance of a fee from a client, and thus could not be accepted by either of the law firms representing plaintiffs. (See fn. 4, *ante*; see also Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 695; cf. *Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252, 263 [90 Cal.Rptr. 169, 475 P.2d 201]; *National Coun. of Com. Mental H. C. Inc.* v. *Weinberger* (D.D.C. 1974) 387 F.Supp. 991, 994-995.)

they seek to recover their attorneys fees, the "common fund" exception is inapplicable. The trial court was correct in so concluding.

(b) *The Substantial Benefit Theory*

██ As we indicated in our opinion in *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, 25, the courts have fashioned another nonstatutory exception to the general rule on the award of attorneys fees. This exception, which may be viewed as an outgrowth of the "common fund" doctrine, permits the award of fees when the litigant, proceeding in a representative capacity, obtains a decision resulting in the conferral of a "substantial benefit" of a pecuniary or nonpecuniary nature. In such circumstance, the court, in the exercise of its equitable discretion, thereupon may decree that under dictates of justice those receiving the benefit should contribute to the costs of its production. Although of fairly recent development in California, this exception to the general rule is now well established in our law.

Although the seminal California case on this subject, *Fletcher* v. *A. J. Industries, supra,* 266 Cal.App.2d 313, arose in the context of corporate litigation,[8] more recent decisions have applied the "substantial benefit" theory in a wide variety of circumstances, including those involving governmental defendants. Thus in *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, a class action, the plaintiffs had secured the issuance of a writ of mandate requiring the board of supervisors to order a full investigation into the loss of property taxes during certain previous years, including the identification of taxable property which had escaped taxation for any reason, and to take appropriate action to recover the taxes due. The Court of Appeal affirmed a judgment awarding the plaintiffs their attorneys fees out of tax revenues to be collected "in consequence of . . . compliance" with the writ of mandate (*id.* at p. 203),

---

[8]In *Fletcher,* a stockholders derivative action, the plaintiffs had obtained an order approving a settlement guaranteeing a beneficial change in corporate management and procedures as well as the arbitration of certain claims of managerial misconduct, with the possibility of future monetary awards. The Court of Appeal, affirming a trial court order awarding attorneys fees and costs to the plaintiffs, held that although no specific "fund" had been created out of which such fees could be awarded on the "common fund" theory, the benefit conferred on the corporation and shareholders justified a shifting of the monetary burden of producing that benefit to all those who would enjoy it. The court placed significant reliance upon certain dicta in the United States Supreme Court's decision in *Sprague* v. *Ticonic Nat. Bank, supra,* 307 U.S. 161, 166-167 [83 L.Ed. 1184, 1186-1187]. (See generally Dawson, *Lawyers and Involuntary Clients: Attorney Fees from Funds, supra,* 87 Harv.L.Rev. 1597, 1609-1611.)

citing *Fletcher* for the proposition that the award was proper even in the absence of an existing "fund."

In the more recent case of *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596 [127 Cal.Rptr. 244], the plaintiff, a state employee, had successfully challenged the state's practice of giving its employees time off with pay on Good Friday as a violation of constitutional prohibitions against the establishment of religion. The Court of Appeal, affirming an award of attorneys fees against the state, held that a substantial benefit had accrued to the state in the form of the future saving of funds formerly expended for work not performed, and that the trial court, exercising its equitable powers in a suit brought in a representative capacity, had properly shifted the cost burden of producing that benefit to the party enjoying it.

Finally, in *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570 [131 Cal.Rptr. 153], the plaintiff taxpayers had secured a judgment declaring invalid a city ordinance purporting to amend an existing redevelopment plan by including areas not covered by the original plan. As a result, certain property tax increment revenues otherwise payable to the redevelopment agency under the amending ordinance became available to various city and county taxing agencies. The Court of Appeal approved a portion of the judgment awarding attorneys fees to be paid by the various taxing agencies in proportion to their respective shares in the tax increment funds, holding that "[t]his result substantially benefits the affected taxing agencies, named in the judgment (and through them their taxpayers), since it reduces both the occasion for the [redevelopment agency's] expenditure of such funds and the [agency's] source of such funds as well." (61 Cal.App.3d at p. 583.)

 Relying on these and other[9] cases, plaintiffs and their attorneys urge that the award in this case was justified on the

---

[9]Among the federal decisions relied upon by plaintiffs and their attorneys are *Hall* v. *Cole* (1973) 412 U.S. 1 [35 L.Ed.2d 702, 93 S.Ct. 1943], and *Newman* v. *State of Alabama* (M.D. Ala. 1972) 349 F.Supp. 278. In *Hall* the United States Supreme Court held that a former union member whose legal action had had the effect of establishing certain rights of free speech within the union was entitled to attorneys fees on the "substantial benefit" theory because the plaintiff, "by vindicating his own right of free speech . . . [had] necessarily rendered a substantial service to his union as an institution and to all of its members . . . [and] reimbursement of [his] attorneys' fees out of the union treasury simply shifts the costs of litigation to 'the class that has benefited from them and that would have had to pay them had it brought the suit.' " (412 U.S. at pp. 8-9 [36 L.Ed.2d at p. 709], fn. omitted.) In *Newman,* where a class action brought by state prisoners had resulted in a holding that inadequate medical treatment afforded them constituted cruel

"substantial benefit" rationale and that the trial court erred in concluding otherwise.[10] In urging that such a benefit was conferred upon the state as a result of this litigation, they make reference to various factual findings .of the trial court on the general subject, the most significant of which are set forth in the margin.[11] To the extent, however,

and unusual punishment within the meaning of the Eighth and Fourteenth Amendments, fees were awarded *against the state* on this theory "because of the positive benefit resulting to the *plaintiffs* and the members of *plaintiffs'* class." (349 F.Supp. at p. 286, italics added.) However the judgment as it related to attorneys fees was subsequently vacated and remanded for reconsideration in light of the intervening decisions in *Alyeska Pipeline Co.* v. *Wilderness Society, supra,* 421 U.S. 240 (to be discussed *infra*) and *Edelman* v. *Jordan* (1974) 415 U.S. 651 [39 L.Ed.2d 662, 94 S.Ct. 1347]. In *Alyeska* the high court, choosing to treat the "substantial benefit" rule as a part of the "common fund" exception, had clearly indicated that fees could be awarded under this rationale only "from the fund or property itself or directly from *the other parties enjoying the benefit*" (421 U.S. at p. 257 [44 L.Ed.2d at p. 153], italics added, fn. omitted), thus suggesting that the approach adopted in *Newman* was erroneous under the federal rule.

[10]Although the trial court found that substantial benefits had been bestowed on the state's public school children and taxpayers by *Serrano* (see fn. 11, *post,* and accompanying text) it concluded that fees could not be awarded on the "substantial benefit" theory because no such benefit had accrued to "the defendants in this case." While we believe, as we explain *infra,* that the trial court properly declined to base its award on this theory, we are also convinced of the correctness of plaintiffs' argument that such an award does not depend upon substantial benefit to the *defendant.* Despite the fact that the trial .court's position on this point may find some support in the language of *D'Amico* and other cases, we have concluded that the proper rule—as reflected in the Court of Appeal cases we have reviewed—"permit[s] reimbursement [of attorneys fees] in cases where the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." (*Mills* v. *Electric Auto-Lite* (1970) 396 U.S. 375, 393-394 [24 L.Ed.2d 593, 607, 90 S.Ct. 616]; see generally Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 662-666.)

[11]The court found, inter alia: "5. Plaintiffs have rendered substantial service to the State Defendants and to the taxpayers of the State generally by bringing defendants into compliance with the mandate of the State Constitution and by securing for defendants and taxpayers the benefits assumed to flow from a nondiscriminatory educational system."

"139. The class of children directly benefited by *Serrano* consists of all children in the State of California who are enrolled in and attending public elementary and secondary schools except those in the intervening defendant districts."

"140. The plaintiff parent-taxpayers class benefited by *Serrano* consists of all parents of children in the California public school system who were also owners of real property assessed for taxes."

"141. Millions of school children and taxpayers other than the named plaintiffs will benefit from the results obtained by plaintiffs in this litigation."

"142. An award of attorneys' fee against the State Defendants will, in effect, spread the costs of the present litigation among those who have benefited from it."

"164. Millions of school children and taxpayers of California will benefit in the years to come as a result of *Serrano.*"

"166. The benefits .of equal education obtained by this case will be multiplied throughout the lives of the children of this state, leading to more equal job opportunities and greater ability to participate in the social, cultural and political activity of our

that the subject findings are susceptible of the reading that substantial benefits in the form of increased educational opportunities have been bestowed upon the school children of this state as a necessary result of the *Serrano* decision—or that benefits in the form of tax savings have been bestowed upon the taxpayers—they are without support. The fundamental holding of *Serrano*—i.e., that the existing school finance system, insofar as it operates to deny equality of educational opportunity to the school children of this state, is thereby violative of state equal-protection guarantees—does nothing in and of itself to assure that concrete "benefits" will accrue to anyone. Only in the event that implementing legislation, in establishing the equality of educational opportunity required by *Serrano*, does so at a level higher than that presently enjoyed by the *least* favored student under the present system will concrete "benefits" accrue to *any* school child; only in the event that that level rises above the level of opportunity available to the *most* favored student under the present system will the required "benefits" accrue to *all* of the school children. By the same token, relative "benefits" to taxpayers will depend wholly upon the tax structure that the Legislature chooses to establish in order to finance its new system. In short, concrete "benefits" can accrue to the state or its citizens in the wake of *Serrano* only insofar as the Legislature, in its implementation of the command of equality which that case represents, chooses to bestow them.[12]

---

society."

"167. The State itself will benefit from the equalization and upgrading of education as a result of *Serrano*."

"176. The State Defendants to some extent benefit from the increased equity and rationality in the taxing system and from a more equitable educational system for the children of this State, both of which are results of *Serrano*."

[12]We are aware, of course, that the Legislature has recently passed and the Governor signed into law an urgency measure directed toward meeting the demands of *Serrano*. (Stats. 1977, ch. 894.) To the extent that this measure will ultimately result in an improvement in educational opportunity for some or all of the state's school children, such improvement will have been brought about by legislative rather than judicial action.

The trial court, in announcing its decision, stated the matter thus: "But one question in this particular case is although there has been a great benefit, undoubtedly, to all of the citizens of the State, has there been any creation of a type of fund or saving of money? On the contrary, all of the argument has been it is going to cost the taxpayers millions of dollars more in order to carry out the Court's decision. Now, it can do that if it is carried out in one way. I don't know what the Supreme Court will say, but I will carefully point out in the approach which I took, which was that the Constitution will guarantee equality of educational opportunity but no minimum level, and the billions of dollars that we are talking about depends upon the decision to bring all school districts in terms of income up to where Beverly Hills is. *That is a political decision, in my opinion, and not a constitutional one.* If the financial affairs of the State won't support such a decision, then I

It is also urged, however, that while *Serrano* may not have had the direct effect of producing increased educational opportunity or tax savings, it did produce benefits of a conceptual or doctrinal character which are shared by the state as a whole. Certain findings of the trial court—notably those numbered 5, 167, and 176 (set forth in fn. 11, *ante*)—support this contention. Common sense as well speaks in favor of the proposition that plaintiffs and their attorneys, as a result of the *Serrano* litigation, have rendered an enormous service to the state and all of its citizens by insuring that the state educational financing system shall be brought into conformity with the equal protection provisions of our state Constitution so that the degree of educational opportunity available to the school children of this state will no longer be dependent upon the taxable wealth of the district in which each student lives. We have concluded, however, that to award fees on the "substantial benefit" theory on the basis of considerations of this nature—separate and apart from any consideration of actual and concrete benefits bestowed—would be to extend that theory beyond its rational underpinnings.[13] If the effectuation of constitutional or statutory policy, without more, is to serve as a sufficient basis for the award of attorneys fees in this state, the rationale for such awards must be found in a theory more directly concerned with considerations of this nature. It is to such a theory that we now turn.

### III

In *D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, plaintiffs had sought an award of fees not only on the "common fund" and "substantial benefit" theories *but also* on two additional theories, both of which were grounded largely on federal case law. The first of these, involving awards against an opponent who has maintained an unfounded action or defense " 'in bad faith, vexatiously, wantonly or for oppressive reasons' " (11 Cal.3d at p. 26), is not involved in the instant case and we do not address ourselves to it. However, the second, the

---

could well see a different approach, in which all school districts would be at a much lower level to come within the State's finances." (Italics added.)

[13]The decisions of the United States Supreme Court in *Mills* v. *Electric Auto-Lite, supra,* 396 U.S. 375, and *Hall* v. *Cole, supra,* 412 U.S. 1, are not inconsistent with this conclusion. In each of those cases a concrete benefit, in the form of informed corporate suffrage in *Mills,* and enhanced union free speech rights in *Hall,* had been achieved by the litigation and bestowed upon the entities against which fees were awarded. (Cf. generally Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation, supra,* 88 Harv.L.Rev. 849, 863-870.) In the instant case, on the other hand, the command of equality emerging from the litigation will afford little more than philosophic comfort to anyone in the absence of a legislative decision to achieve that equality by raising the disadvantaged to the level of the favored, rather than vice versa.

so-called "private attorney general" concept, was adopted by the trial court as the basis for its award, and we are now called upon to determine its applicability in this jurisdiction.

In addressing ourselves to the "private attorney general" theory in *D'Amico,* we said "This concept, as we understand it, seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." (11 Cal.3d at p. 27.) Noting, however, that such doctrine was then under examination by the United States Supreme Court, we thought it prudent to await "an announcement by the high court concerning its limits and contours on the federal level" (*id.*) before determining its possible applicability in this jurisdiction.

The announcement has now been made. In *Alyeska Pipeline Co.* v. *Wilderness Society, supra,* 421 U.S. 240,[14] a five to two opinion authored by Justice White, the Supreme Court held that the awarding of attorneys fees on a "private attorney general" theory, in the absence of express statutory authorization, did not lie within the equitable jurisdiction of the federal courts. Such awards, the court held, "would make major inroads on a policy matter that Congress has reserved for itself." (421 U.S. at p. 269 [44 L.Ed.2d at p. 159].)

The high court rested its conclusion on two bases. The first, involving the interpretation of an 1853 court costs act, need not long concern us here, for the act in question (presently 28 U.S.C. §§ 1920, 1923) bears little resemblance to the governing statute in this state, section 1021 of the Code of Civil Procedure. ▮ In any event the fashioning of equitable exceptions to the statutory rule to be applied in California is a matter within the sole competence of this court.[15] The second basis on which the Supreme Court grounded its decision, however, dealing with the manageability and fairness of such awards in the absence of legislative guidance, goes directly to the heart of the determination here before us. The making of such awards in the absence of statutory authorization, the high court indicated, would leave the courts "free to

---

[14]The case involving this question which was before the high court at the time of *D'Amico* was later vacated on other grounds. (*Bradley* v. *School Board of Richmond, Virginia* (E.D.Va. 1971) 53 F.R.D. 28, revd. (4th Cir. 1972) 472 F.2d 318, vacated on other grounds (1974) 416 U.S. 696 [40 L.Ed.2d 476, 94 S.Ct. 2006].)

[15]This was expressly recognized by the high court in *Alyeska* itself. (See 421 U.S. at p. 259, fn. 31 [44 L.Ed.2d at p. 154].)

fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party . . . or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases." (421 U.S. at p. 269 [44 L.Ed.2d at pp. 159-160].) This, the court suggested, would represent an unacceptable and unwise intrusion of the judicial branch of government into the domain of the Legislature.

It is with this consideration foremost in mind that we must assess the arguments advanced by plaintiffs and amici curiae in support of our adoption of the "private attorney general" concept in our state. Those arguments may be briefly summarized as follows: In the complex society in which we live it frequently occurs that citizens in great numbers and across a broad spectrum have interests in common. These, while of enormous significance to the society as a whole, do not involve the fortunes of a single individual to the extent necessary to encourage their private vindication in the courts. Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative. Because the issues involved in such litigation are often extremely complex and their presentation time-consuming and costly, the availability of representation of such public interests by private attorneys acting *pro bono publico* is limited. Only through the appearance of "public interest" law firms funded by public and foundation monies, argue plaintiffs and amici, has it been possible to secure representation on any large scale. The firms in question, however, are not funded to the extent necessary for the representation of all such deserving interests, and as a result many worthy causes of this nature are without adequate representation under present circumstances. One solution, so the argument goes, within the equitable powers of the judiciary to provide, is the award of substantial attorneys fees to those public-interest litigants and their attorneys (whether private attorneys acting *pro bono publico* or members of "public interest" law firms) who are successful in such cases, to the end that support may be provided for the representation of interests of similar character in future litigation.

In the several cases in which the courts, persuaded by these and similar arguments, have granted fees on the "private attorney general"

theory, various formulations of the rule have appeared. In spite of variations in emphasis, all of these formulations seem to suggest that there are three basic factors to be considered in awarding fees on this theory. These are in general: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision. (See generally, Comment, *Equal Access, supra,* 122 U.Pa.L.Rev. 636, 666-674.)[16] Thus it seems to be contemplated that if a trial court, in ruling that a motion for fees upon this theory, determines that the litigation has resulted in the vindication of a strong or societally important public policy, that the necessary costs of securing this result transcend the individual plaintiff's pecuniary interest to an extent requiring subsidization, and that a substantial number of persons stand to benefit from the decision, the court may exercise its equitable powers to award attorney fees on this theory.

It is at once apparent that a consideration of the first factor may in instances present difficulties since it is couched in generic terms, contains no specific objective standards and nevertheless calls for a subjective evaluation by the judge hearing the motion as to whether the litigation before the court has vindicated a public policy sufficiently strong or important to warrant an award of fees. We are aware of the apprehension voiced in some critiques that trial courts, whose function it is to apply existing law, will be thrust into the role of making assessments of the relative strength or weakness of public policies furthered by their decisions and of determining at the same time which public policy should be encouraged by an award of fees, and which not—a role closely approaching that of the legislative function. (See generally, Comment,

---

[16]A fourth factor, suggested by Justice Marshall in his dissenting opinion in *Alyeska,* was the extent to which "shifting [the cost of litigation] to the defendant would effectively place it on a class that benefits from the litigation." (421 U.S. at p. 285 [44 L.Ed.2d at p. 169].) The majority, however, in responding to this suggestion, point out that to impose this limitation would result in an expanded version of the "substantial benefit" rule rather than a true "private attorney general" rationale. "When Congress has provided for allowance of attorneys' fees for the private attorney general," the majority stated, "it has imposed no such common-fund conditions upon the award. The dissenting opinion not only errs in finding authority in the courts to award attorneys' fees, without legislative guidance, to those plaintiffs the courts are willing to recognize as private attorneys general, but also disserves that basis for fee shifting by imposing a limiting condition characteristic of other justifications." (421 U.S. at p. 265, fn. 39 [44 L.Ed.2d at p. 157].) We find this reasoning persuasive. The "private attorney general" theory must be accepted or rejected on its own merits—i.e., as a theory rewarding the effectuation of significant policy—rather than as a policy-oriented extension of the "substantial benefit" theory burdened with the limitations of that rationale.

*Equal Access, supra,* 122 U.Pa.L.Rev. 636, 670-671; Comment, *The Supreme Court, 1974 Term* (1975) 89 Harv.L.Rev. 1, 178-180.)[17] Since generally speaking the enactment of a statute entails in a sense the declaration of a public policy, it is arguable that, where it contains no provision for the awarding of attorney fees, the Legislature was of the view that the public policy involved did not warrant such encouragement. A judicial evaluation, then, of the strength or importance of such statutorily based policy presents difficult and sensitive problems whose resolution by the courts may be of questionable propriety.

Such difficulties, however, are not present in the instant case. The trial court, in awarding fees to plaintiffs, found that the public policy advanced by this litigation was not one grounded in statute but one grounded in the *state Constitution.* Thus, the trial court concluded as a matter of law: "If as a result of the efforts of plaintiffs' attorneys rights created or protected by *the State Constitution* are protected to the benefit of a large number of people, plaintiffs' attorneys are entitled to reasonable attorney's fees from the defendants under the private attorney general equitable doctrine." (Italics added.) Its factual findings, which are not here challenged, establish that the interests here furthered were *constitutional* in stature.[18] Those findings also make clear that the benefits flowing from this adjudication are to be widely enjoyed among the citizens of this

---

[17]Thus in rejecting the private attorney general theory in *Alyeska,* the high court declared that such a rule "would make major inroads on a policy matter that Congress has reserved for itself" and that federal courts "are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party in federal litigation or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases." (*Alyeska Pipeline Co.* v. *Wilderness Society, supra,* 421 U.S. 240, 269.[44 L.Ed.2d 141, 159-160].)

[18]The trial court found, inter alia, that "[t]he plaintiffs . . . have proven that the sum of money available for public education in California is not being spent in accordance with the California Constitution" and that "[t]he efforts of plaintiffs' attorneys . . . have assured that the billions of dollars spent every year in California on education will be spent in accordance with the California Constitution."

The determination that the public policy vindicated is one of constitutional stature will not, of course, be in itself sufficient to support an award of fees on the theory here considered. Such a determination simply establishes the first of the three elements requisite to the award (i.e., the relative societal importance of the public policy vindicated). (See text accompanying fn. 16, *ante.*) Only if it is also shown (2) that the necessity for private enforcement in the circumstances has placed upon the plaintiff a burden out of proportion to his individual stake in the matter, and (3) that the benefits flowing from such enforcement are to be widely enjoyed among the state's citizens—only then will an award on the "private attorney general" theory be justified.

state[19] and that the nature of the litigation was such that subsidization of the plaintiffs is justified in the event of their victory.[20] In these circumstances we conclude that an award of attorneys fees to plaintiffs and their attorneys was proper under the theory posited by the trial court.

So holding, we need not, and do not, address the question as to whether courts may award attorney fees under the "private attorney general" theory, where the litigation at hand has vindicated a public policy having a statutory, as opposed to, a constitutional basis. The resolution of this question must be left for an appropriate case.

In sum, we hold that in the light of the circumstance of the instant case, the trial court acted within the proper limits of its inherent equitable powers when it concluded that reasonable attorneys fees should be awarded to plaintiffs' attorneys[21] on the "private attorney general" theory.

## IV

It should be clear from what we have said above that the eligibility of plaintiffs' attorneys for the award of fees granted in this case is not affected under the "private attorney general" theory by the fact that plaintiffs are under no obligation to pay fees to their attorneys, or the further fact that plaintiffs' attorneys receive funding from charitable or

---

[19] The trial court found, for example, that "*Serrano* protects the right of every California child to receive a quality of education not dependent on the wealth of the school district in which he or she lives," and that "*Serrano* guarantees that the correlation between tax effort and educational quality will be equal for all children and taxpayers throughout the State of California."

[20] The trial court found, for example, that "[t]he plaintiffs in *Serrano* individually did not have the resources to retain counsel to vindicate their rights to equitable educational and taxation systems," and that "[b]ecause of the nature of the constitutional rights involved in this case, neither the California Attorney General nor any other public or governmental counsel could reasonably have been expected to institute litigation to vindicate the rights asserted by the plaintiffs in this case."

[21] The propriety of a direct award to the plaintiffs' attorney, rather than to plaintiffs themselves, in the exercise of the court's equitable powers, is no longer questioned in the federal courts. (See *Central R. R. & Banking Co.* v. *Pettus* (1885) 113 U.S. 116, 124-125 [28 L.Ed. 915, 918, 5 S.Ct. 387]; *Brandenberger* v. *Thompson* (9th Cir. 1974) 494 F.2d 885, 889; *Miller* v. *Amusement Enterprises, Inc.* (5th Cir. 1970) 426 F.2d 534, 539 [16 A.L.R.Fed. 613]; *Townsend* v. *Edelman* (7th Cir. 1975) 518 F.2d 116, 122-123; see Comment, *Awards of Attorney's Fees to Legal Aid Offices* (1973) 87 Harv.L.Rev. 411, 422.) The equity powers of California courts are no less expansive in this respect. (See *Knoff* v. *City etc. of San Francisco, supra*, 1 Cal.App.3d 184, 203-204; *Horn* v. *Swoap* (1974) 41 Cal.App.3d 375, 383-384 [116 Cal.Rptr. 113].)

public sources. Because the basic rationale underlying the "private attorney general" theory which we here adopt seeks to encourage the presentation of meritorious constitutional claims affecting large numbers of people, and because in many cases the only attorneys equipped to present such claims are those in funded "public interest" law firms, a denial of the benefits of the rule to such attorneys would be essentially inconsistent with the rule itself. (See generally Comment, *Awards of Attorney's Fees to Legal Aid Offices, supra,* 87 Harv.L.Rev. 411.) The propriety of such awards under statutory provisions is already well-established in this state (see *Horn* v. *Swoap, supra,* 41 Cal.App.3d 375, 383-384; *Trout* v. *Carleson* (1974) 37 Cal.App.3d 337, 342-343 [112 Cal.Rptr. 282]), and similar considerations are applicable when the award is made under the court's equitable powers.

## V

 We reject the contention of Public Advocates, Inc.[22] that the fee awarded it was inadequate in light of all the circumstances. It is urged that the trial court, in limiting its award to Public Advocates to the admittedly substantial amount of $400,000, failed to take adequate account of the novelty and extreme difficulty of this litigation, its extremely contingent character, the significance of the issues determined, and the standard which the award in this case will set for similar awards in future cases. However, the record clearly indicates that the court considered all of these factors, among many others, in making its determination. Fundamental to its determination—and properly so[23]—was a careful compilation of the time spent and reasonable hourly compensation of each attorney and certified law student involved in the presentation of the case. That compilation yielded a total dollar figure of $571,172.50, of which $225,662.50 was applicable to Public Advocates, Inc., $320,710 to Western Center on Law and Poverty, and $24,800 to

---

[22]As indicated above, Western Center on Law and Poverty does not join in this contention.

[23]We are of the view that the following sentiments of the United States Court of Appeals for the Second Circuit, although uttered in the context of an antitrust class action, are wholly apposite here: "The starting point of every fee award, once it is recognized that the court's role in equity is to provide just compensation for the attorney, must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts." (*City of Detroit* v. *Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 470; see also *Lindy Bros. Bldrs., Inc. of Phila.* v. *American R. & S. San. Corp.* (3d Cir. 1973) 487 F.2d 161, 167-169; see generally Dawson, *Lawyers and Involuntary Clients in Public Interest Litigation, supra,* 88 Harv.L.Rev. 849, especially pp. 925-929.)

time spent by certified law students. Using these figures as a touchstone, the court then took into consideration various·relevant factors, of which some militated in favor of augmentation and some in favor of diminution. Among these factors were: (1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved;[24] (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed; and (7) the fact that in the court's view the two law firms involved had approximately an equal share in the success of the litigation. Taking all of these factors into consideration, the court proceeded to make a total award in the amount of $800,000, to be shared equally by each of the two law firms representing plaintiffs.

■ The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." (*Harrison* v. *Bloomfield Building Industries, Inc.* (6th Cir. 1970) 435 F.2d 1192, 1196; see *Mandel* v. *Hodges, supra,* 54 Cal.App.3d 596, 624.) ■ We find no abuse of discretion here.

## VI.

As indicated at the outset of this opinion, in *Serrano II* we specifically reserved jurisdiction for the purpose of determining plaintiffs' motion filed in this court on January 28, 1977, for attorneys' fees for services rendered in connection with the *Serrano II* appeal–which appeal was prosecuted only by certain officers of the County of Los Angeles and certain intervening school districts. (See 18 Cal.3d at p. 777.) On July 7, 1977, plaintiffs filed a letter request, which we treat as a supplementary motion, seeking additional fees for services rendered in opposing an unsuccessful petition for writ of certiorari filed by the aforesaid appellants in the United States Supreme Court. Finally, on October 31, 1977, plaintiffs filed a motion in this court for attorneys' fees for services

[24]While as we have indicated the fact of public or foundational support should not have any relevance to the question of eligibility for an award, we believe that it may properly be considered in determining the size of the award.

rendered in connection with the instant appeal–which appeal was prosecuted only by certain state officers. All of these motions are now before us for decision. We have determined, however, in the interest of avoiding further delay in the finality of the instant decision while permitting all parties to be fully heard in these matters, that all of the aforesaid motions should be remanded to the trial court with directions to hear and determine them in light of the principles set forth in this opinion. (See *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 483, 485; *No Oil, Inc.* v. *City of Los Angeles* (1975) 13 Cal.3d 486, 487.) In each instance, the award of attorneys' fees, if any, shall be made and assessed only against said defendants and appellants appealing in the respective appeal, or such of them as the trial court in the exercise of its equitable discretion shall determine.

The order concerning attorneys' fees filed August 1, 1975 is affirmed. The cause is remanded to the trial court with directions to hear and determine plaintiffs' motions for attorneys' fees filed in this court on January 28, 1977, July 7, 1977, and October 31, 1977, in conformity with the views herein expressed and to make and enter all necessary and appropriate orders.

Tobriner, Acting C. J., Mosk, J., Wright, J.,* and Kaus, J.,† concurred.

**RICHARDSON, J.**—I respectfully dissent. In the absence of any statutory authority therefor, the majority awards substantial attorneys' fees to plaintiffs on the ground that plaintiffs' counsel acted in the capacity of "private attorneys general" in vindicating constitutional rights for a large segment of our state's population. I have previously, in my dissenting opinion in *Serrano II* (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 777-785 [135 Cal.Rptr. 345, 557 P.2d 929]), expressed the reasons for my disagreement with the majority's premise that plaintiffs were denied equal protection of the laws under the state Constitution.

However, accepting as I must the *Serrano II* holding of a constitutional infringement, again with due deference, in considering the majority's proposed "private attorney general" doctrine, I find more persuasive the rationale of the United States Supreme Court expressed recently in *Alyeska Pipeline Co.* v. *Wilderness Society* (1975) 421 U.S. 240 [44 L.Ed.2d 141, 95 S.Ct. 1612], in which it declined to approve the doctrine in the absence of statutory guidance in this area. In passing, I note a

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairperson of the Judicial Council.

†Assigned by the Chairperson of the Judicial Council.

touch of irony in the fact that very recently we likewise and unanimously refused an invitation to adopt the identical "private attorney general" doctrine herein approved by the majority, observing that "the doctrine is currently under examination by the United States Supreme Court . . . and, pending an announcement by the high court concerning its limits and contours on the federal level, we decline to consider its possible application in this state." (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 27 [112 Cal.Rptr. 786, 520 P.2d 10].) The Supreme Court now has spoken, but the majority, ignoring its awaited reasoning and lessons, adopts a rule which the high court carefully considered and rejected. To me, *Alyeska's* thesis is both compelling and fully applicable here for reasons which I briefly develop.

First, the high court noted that "Although . . . . Congress has made specific provision for attorneys' fees under certain federal statutes, it has not changed the general statutory rule that allowances for counsel fees are limited to the sums specified by the costs statute." (421 U.S. at pp. 254-255 [44 L.Ed.2d at pp. 151-152].) The high tribunal, cognizant of broad congressional authority over the matter of attorneys' fees and court costs, reasoned further that "Under this scheme of things, it is apparent that the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine." (*Id.,* at p. 262 [44 L.Ed.2d at p. 156], fn. omitted.)

Similarly, California, acting through its Legislature in parallel fashion, has expressly limited the manner of the award of attorneys' fees. "*Except as attorney's fees are specifically provided for by statute,* the measure and mode of compensation . . . is left to the agreement, express or implied, of the parties . . . ." (Code Civ. Proc., § 1021, italics added.) As with the Congress under the federal scheme, the California Legislature has clearly and "specifically provided . . . by statute" for attorneys' fees to be recovered in particular actions; as examples, in the Code of Civil Procedure, defamation (§ 836), condemnation, abandonment and dismissal (§ 1268.610), wage claim in municipal court (§ 1031), partition (§ 874.010, subd. (a)), and, in the Civil Code, dissolution of marriage (§ 4370). It has not elected as yet to provide for such recovery in actions such as the present one. The federal and California patterns are closely parallel. I think the better procedure is to accept the *Alyeska* model and, by recognizing the demonstrated legislative interest, to refrain from developing our own nonstatutory bases for such awards, thus deferring to the Legislature in this area in the same manner as the Supreme Court has deferred to the Congress.

Second, I am further persuaded of the wisdom of the *Alyeska* reasoning by the high tribunal's anticipation of the very considerable difficulty which courts would experience in attempting to "pick and choose," among the multitudinous enactments, those particular statutes in which the public policy at issue is sufficiently "important" to justify recovery on a "private attorney general" theory. The Supreme Court voiced its legitimate concern in these words: "[I]t would be difficult, indeed, for the courts, without legislative guidance, to consider some statutes important and others unimportant and to allow attorneys' fees only in connection with the former." (421 U.S. at pp. 263-264 [44 L.Ed.2d at p. 157].) We face identical obstacles which are not lowered because they are of state rather than federal origin.

Furthermore, and finally, the majority's proposed refinement, limiting awards to cases involving *constitutional* rights, fails to avoid the pitfalls readily foreseen in *Alyeska*. A glance at our state Constitution discloses in article I alone, numerous "rights" of varying degrees of importance, ranging from the inalienable right to life, liberty and property (§ 1) to the right to fish in public waters (§ 25). Each of them presumably is a "constitutional" right.

Will the ambit of "rights" to which the doctrine applies be narrow or wide ranging? The majority recognizes the need for refinement and limitation of the principle but defers the difficult inquiry for an appropriate case," finding that the present matter has a constitutional rather than a statutory basis. One's lingering unease is not entirely allayed, however, since the majority in *Serrano II* in the course of its determination of those rights which it deemed "fundamental" for equal protection purposes stated, "Suffice it to say that we are constrained no more by inclination than by authority to gauge the importance of rights and interests affected by legislative classifications wholly through determining the extent to which they are 'explicitly or implicitly guaranteed' . . . by the terms of our compendious, comprehensive, and distinctly mutable state Constitution." (*Serrano* v. *Priest, supra,* 18 Cal.3d 728, 767, fn. omitted.) The inescapable meaning of the foregoing language is that the "importance," nature and quality of "constitutional rights," in the sense used by the majority, is "open ended"—a right is not necessarily "fundamental" merely because it is incorporated in the state Constitution. If such is the case, it is exceedingly difficult to understand why, for purposes of applying the "private attorney general" concept, vindication of every such "constitutional" right will be considered important enough to qualify for an award of attorneys' fees.

In view of the foregoing considerations and uncertainties, and particularly because of the force and clear legislative expression of section 1021 of the Code of Civil Procedure, and the cogent analysis of the United States Supreme Court in *Alyeska,* it seems to me much wiser to await further legislative guidance on the matter of attorneys' fees. In the final analysis, and as a practical matter, it is the Legislature, presumably, that must find the funds to pay the bill. The absence of any specific legislative authorization is especially troublesome in this case, because substantial sums ($800,000) are awarded from the public treasury to publicly or charitably supported attorneys to whom the plaintiffs themselves legally owe nothing for services. From a policy standpoint, other factors may render this result entirely appropriate but those considerations should be legislatively expressed and defined.

I would reverse the judgment and deny the motion for attorneys' fees on appeal.

Clark, J., concurred.

**CLARK, J.,** Dissenting.—While joining the dissent of Justice Richardson, I add several considerations. Establishing an open-ended monetary-reward program to subsidize lawyers who successfully prosecute constitutional litigation, the majority opinion usurps the legislative function.

The majority opinion points to neither constitutional nor statutory requirement that attorneys be compensated for successfully pursuing constitutional litigation in behalf of what they deem to be the public interest. Moreover, in the instant case the majority opinion frankly concedes that neither taxpayer nor school child is assured of any concrete benefit by the *Serrano II* decision.[1] (*Ante,* p. 41.) Rather, the majority decide for policy reasons, usually reserved to the Legislature, that constitutional litigation should be promoted in circumstances where the only real winners can be the subsidized attorneys. If the majority's goal is to promote constitutional litigation, they have chosen a productive formula. The majority's view that vindication of constitutional rights is important and that litigation to that end should be encouraged is

---

[1]Essentially *Serrano II* requires a reallocation of tax resources and of educational funding. As pointed out in my dissent (*Serrano II,* 18 Cal.3d 728, 785 [135 Cal.Rptr. 345, 557 P.2d 929]), the reallocation will primarily involve taking from the poor and giving to those more economically fortunate. While some taxpayers and some students may be expected to profit by *Serrano II* and others suffer, members of the two groups cannot be precisely identified. The award of attorney fees runs against the stte generally with no effort to apportion it between winners or losers.

laudable. But the majority's financial backing of that view constitutes an improper judicial prerogative that is unacceptable.

Until today, California judges have entertained neither the dream nor the power to endorse a particular social program, appropriate the requisite money from the public treasury to fund it, and then order payment to those deemed deserving. I have always thought such authority to be vested exclusively in the Legislature. However, if the judiciary is to partake of the legislative process, should we not do so in a deliberative, parliamentarian manner? Should we not appoint committees and hold public hearings to determine whether, in the absence of reward money, charitable foundations, public-spirited attorneys or tax funded law firms, like the one before us, will adequately seek to vindicate constitutional rights? We should also be informed whether the subsidy will likely produce results commensurate with the costs, and whether other methods of financing constitutional litigation might be more effective. And the ultimate step in the budget-making process must be taken—to determine whether other important social programs are more in need of limited tax funds. We, of course, have done none of these things because, unlike the Legislature, we are neither equipped nor empowered to do so.

Finally, the majority in recognition of the dangers inherent in the private attorney general concept, purport to limit the concept to only those instances when constitutional rights are vindicated in the face of legislative or executive default. Not only is this a limitation without bounds, but the reward becomes nothing more—nor is it less—than a bounty for searching out and invalidating constitutionally vulnerable legislative or executive action. Our Constitution, of course, establishes a government of three equal branches—legislative; executive, and judicial. Is it any more appropriate for the judiciary to offer a bounty for legislative or executive hide, than it is for those branches to seek ours?

The petition of the defendants and appellants for a rehearing was denied November 17, 1977, and the opinion was modified to read as printed above. Bird, C. J., and Manuel, J., did not participate therein. Sullivan, J.,* and Wright, J.,† participated therein. Clark, J., and Richardson, J., were of the opinion that the petition should be granted. Clark, J., did not concur in the modification.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairperson of the Judicial Council.