[No. B219626. Second Dist., Div. Eight. May 2, 2011.]

ESPERANZA ROGEL et al., Plaintiffs and Appellants, v.
LYNWOOD REDEVELOPMENT AGENCY, Defendant and Respondent.

## COUNSEL

Western Center on Law and Poverty, Richard A. Rothschild; Public Counsel, Shashi Hanuman, Lisa R. Jaskol; Gibson, Dunn & Crutcher, Wayne Barsky, Marcellus McRae, Carol A. Fabrizio; California Affordable Housing Law Project Public Interest Law Project, Michael F. Rawson, Craig Castellanet; Law Office of Rebecca F. Thornton and Rebecca F. Thornton for Plantiffs and Appellants.

Kane, Ballmer & Berkman, Royce K. Jones and Donald P. Johnson for Defendant and Respondent.

## OPINION

**BIGELOW, P. J.**—It is well settled that a trial court is vested with wide discretion in fixing the amount to be awarded to a prevailing party for attorneys' fees, and that a court's award will not be disturbed on appeal unless the record discloses an abuse of discretion. (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*).) The primary question here is whether the trial court abused its discretion by applying a negative multiplier in setting the amount of an attorneys' fees award against a government agency based on the conclusion that it would be "better" for less money to be paid to the prevailing parties for their attorneys' fees so as to leave the agency with more money for its ongoing governmental operations. We find this is not an appropriate factor upon which to reduce otherwise documented attorneys' fees.

# FACTS

## The Statutory Setting for the Litigation

The community redevelopment law (CRL; Health & Saf. Code, § 33000 et seq.)[1] is a comprehensive statutory scheme intended to help local governments revitalize blighted areas. To accomplish this end, the CRL allows for the financing of redevelopment projects through "tax increment financing." Tax increment financing works this way: redevelopment agencies do not have the power to tax, but may finance redevelopment projects through loans or the sale of bonds. When a redevelopment project results in increased property values, the tax attributable to the increase in value—the "tax increment"—is collected by the taxing authority and distributed to the redevelopment agency, which then uses the money to pay off its debt. The basic concept is a redevelopment project " 'in effect pays for itself.' " (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866 [62 Cal.Rptr.3d 614, 161 P.3d 1168].)

In recent years, the Legislature has enacted a number of statutes out of a concern that implementation of the CRL may adversely impact housing, particularly low-income housing. For example, section 33334.2 requires redevelopment agencies to set aside "not less than 20 percent" of its tax increment proceeds in a low- and moderate-income housing (LMIH) fund. Other statutes require agencies to provide relocation benefits to persons displaced by a redevelopment (§§ 33411, 33411.1), to include prescribed percentages of units for low- and moderate-income housing in redevelopment-assisted housing projects, with covenants to keep those units affordable for prescribed periods, and to replace affordable units lost because of redevelopment activities (§§ 33413, 33418).

## The Litigation

In December 2006, Esperanza Rogel and other residents of a mobilehome park (Plaintiffs) in the City of Lynwood (City) filed a complaint and verified petition for writ of mandate against the City, the City Council of the City of Lynwood, and the Lynwood Redevelopment Agency (LRDA). Plaintiffs' complaint alleged that a proposed plan to change the mobilehome park into townhomes would result in the loss of low-income rental housing units and would force Plaintiffs out of the City because it otherwise lacked housing they could afford. Plaintiffs alleged that the LRDA had violated (and had a history of violating) statutes requiring relocation assistance, setting aside money to assist affordable housing goals, and building affordable units with covenants to keep them affordable. Plaintiffs prayed for declaratory and

---

[1] All further section references are to the Health and Safety Code, unless otherwise stated.

injunctive relief against the LRDA, and for a writ of traditional mandate directing the City, through its city council, to prepare and adopt a housing component into the City's general plan compliant with statutorily mandated elements. In April 2007, following procedural matters not relevant to the current appeal, Plaintiffs filed a first amended complaint and writ petition which largely realleged the claims summarized above.

In August 2007, the trial court (Hon. Dzintra Janavs) denied Plaintiffs' petition for writ of mandate against the City and city council. In October 2007, the court lifted a stay of Plaintiffs' claims against the LRDA and transferred the case for reassignment to a trial department.[2]

Plaintiffs' initial lawyers were affiliated with Public Counsel and the California Affordable Housing Law Project. In October 2007, Plaintiffs filed notice that the law firm of O'Melveny & Myers LLP (O'Melveny) had become associated as Plaintiffs' cocounsel.

In January 2008, the LRDA moved to stay discovery until Plaintiffs' appeal of the denial of their writ petition had been completed. The parties later stipulated to take the motion off calendar. In April 2008, the LRDA filed a motion to strike almost 200 allegations from Plaintiffs' first amended complaint, including single words such as "unlawful," references to the City (on the ground the City was no longer a party), and dozens of other passages which, in the eyes of the LRDA, constituted objectionable legal conclusions. In June 2008, the trial court denied the LRDA's motion upon finding the agency was attacking "unimportant" parts of the pleading. At the same time, the court set a trial date for December 2008.

During the ensuing course of the litigation, the LRDA repeatedly failed to respond to discovery, and Plaintiffs filed multiple discovery-related motions. The record suggests that the LRDA's repeated failures to comply with discovery were the result of its internal failures to maintain ordinary records. At various times, the LRDA claimed it could not locate documents concerning budgets, general ledgers, bank accounts, and audit reports. In this vein, the LRDA's housing manager and the person it designated as "most qualified" to testify on affordable housing issues both testified the LRDA's records were so disorganized that it would be difficult for the agency even to determine the number of redevelopment projects in which it had been

---

[2] Plaintiffs filed an appeal from the judgment in the writ proceeding against the City. (*Rogel v. City of Lynwood* (May 22, 2008, B203280).) The appeal was dismissed in May 2008. The issues in Plaintiffs' writ proceeding are not involved in the current appeal. The writ proceeding is relevant to the current appeal only to the extent that some portion of Plaintiffs' aggregate attorneys' fees were incurred for legal services discretely attributable to the writ proceeding.

involved. In the words of LRDA's lawyer at one hearing: "I know that the Agency does not have a very good record of what it did in 1994 to 2001 simply because that's too long ago." Because of the LRDA's deficient record keeping, Plaintiffs' lawyers were sometimes required to recreate records the LRDA should have routinely prepared, maintained and produced.

Plaintiffs' discovery efforts included the following: In May 2008, Plaintiffs filed a motion to compel responses to their request for production of documents. In September 2008, Plaintiffs filed a motion to compel further response to their request for production of documents, and a motion to compel further responses to their requests for admissions and their form interrogatories. In December 2008, Plaintiffs filed a motion for issue and evidence sanctions based on the LRDA's discovery failures, a motion for an order deeming Plaintiffs' requests for admissions admitted (and to compel responses to special interrogatories), and a motion to produce documents responsive to Plaintiffs' second request for production of documents. For all practical purposes, Plaintiffs won all of their discovery-related motions.

On December 23, 2008, the trial court granted in part Plaintiffs' motion for issue and evidence sanctions against the LRDA. The court ordered that matters included in three sets of Plaintiffs' requests for admissions were to be deemed admitted, and that the LRDA could not introduce evidence of any document responsive to Plaintiffs' first request for production of documents unless the documents were produced by December 31, 2008. The court also imposed monetary sanctions against the LRDA.

Meanwhile, O'Melveny's ability or agreeability to continue with its role as Plaintiffs' cocounsel "became more limited." In August 2008, Plaintiffs' public interest lawyers persuaded Gibson, Dunn & Crutcher LLP to assume the role of lead cocounsel in preparation for trial.

On January 2, 2009, the LRDA served its response to requests for admissions, admitting each matter covered by the discovery request. Together, the matters deemed admitted by the trial court's December 23, 2008 order and the LRDA's January 2, 2009 admissions essentially established the following elements of Plaintiffs' action:

—The LRDA never provided relocation assistance to persons displaced from dwelling units within its jurisdiction.

—The LRDA never determined how many housing units it should have produced to fulfill its housing obligations, or how many housing units it had actually produced.

—The LRDA had no evidence that, since January 1994, it had satisfied any of its housing obligations related to any of its redevelopment projects.

—Since January 1994, the LRDA had failed to assure that dwelling units developed or substantially rehabilitated within its jurisdiction were made available at an affordable housing cost to, and occupied by, persons of low or moderate income.

—Since January 1994, the LRDA had failed to produce the number of replacement dwelling units it was obligated to produce.

—The LRDA had no evidence that it satisfied any of its replacement housing obligations from January 1994 to September 2006, and, since 2006, the LRDA had produced no replacement dwelling units.

—Since January 1994, the LRDA had failed to deposit the prescribed percentage of its tax increment (not less than 20 percent) into a LMIH fund.

—The LRDA failed to record any affordability covenants for housing units in any redevelopments.

—Since January 1994, the LRDA's redevelopment activities had discriminatory, adverse, and disproportionate impact on racial and ethnic minorities, persons with disabilities, and families with children, and further discriminated against the development of housing reserved for occupancy by lower income households.

On February 17, 2009 (at which time trial was set to begin on Feb. 23, 2009), the LRDA approved a settlement. On March 23, 2009, the trial court signed and entered a stipulation and order incorporating the settlement agreement. The court's March 23 order included the following provisions, among others: (1) the LRDA shall develop a minimum of 42 "inclusionary dwelling units" within four years, and develop and make available for occupancy by March 2015 another 49 "replacement dwelling units"; (2) the LRDA shall record affordability covenants on all newly developed inclusionary and replacement dwelling units; (3) the LRDA shall establish, fund, administer, and use in accordance with applicable law a separate and segregated LMIH fund; (4) the LRDA must deposit $250,000 into the LMIH fund to replace improperly expended funds; (5) the LRDA shall provide full payment of all relocation assistance owed to persons displaced by LRDA activities, including the named Plaintiffs; and (6) the LRDA shall submit specified issues to a redevelopment "specialist" who will make final and binding determinations of inappropriate LRDA expenditures from the LMIH fund, as well as any related penalties for which the LRDA may be liable.

The settlement agreement included this provision addressing attorneys' fees: "Plaintiffs shall not be precluded from seeking to recover reasonable

attorneys' fees and costs . . . for the prosecution of this action. However, notwithstanding the foregoing, nothing in [the] Settlement Agreement or otherwise *shall preclude the [LRDA] from raising its financial condition (including the financial obligations assumed by the [LRDA] in connection with this Settlement Agreement) in response to any such effort to recover [reasonable attorneys' fees and costs]*, nor shall anything in this Settlement Agreement preclude Plaintiffs from responding to any such argument by the [LRDA]." (Italics added.)

In April 2009, Plaintiffs filed a motion for an award of attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5, supported by a series of attorneys' declarations and accompanying billing documentation. The aggregate sum requested or "lodestar based on the hours worked and applicable hourly rates" totaled approximately $2.7 million. Plaintiffs asked the trial court to apply a multiplier of 1.2 to the lodestar in light of the complexity of the issues, the skill displayed in litigating the case, the results obtained, the importance of the case, and the risk taken by Plaintiffs' lawyers in pursuing the litigation.[3]

The LRDA opposed Plaintiffs' motion for attorneys' fees on three principle grounds: (1) the most it could pay in attorneys' fees without harming its affordable housing mission (including its obligations under the settlement agreement) was roughly $160,000; (2) Plaintiffs' lawyers had inflated the lodestar; and (3) the LRDA had incurred far less in attorneys' fees. The LRDA further argued the case involved "straightforward statutory issues," and the Plaintiffs had obtained only "limited success." Based on all of these factors, the LRDA asserted that a "negative" multiplier was appropriate.

At a hearing on May 20, 2009, the trial court noted Plaintiffs "clearly" were entitled to an award of attorneys' fees. It made repeated statements over the course of the hearing to the effect that the case had resulted in a substantial public benefit, and that the LRDA may never have developed affordable housing units without being motivated by the litigation. The court specifically described the result as "a benefit to the citizens of Lynwood and to the county as a whole." At the same time, however, the court requested additional briefing to help determine the amount of the fees award. It specifically indicated it was interested in the attorneys' fees language in the settlement agreement dealing with the LRDA's "financial condition."

Plaintiffs' supplemental briefing argued the settlement agreement did not require the court to consider the LRDA's alleged financial condition in determining the amount of the attorneys' fees award, only that the LRDA

---

[3] Plaintiffs' request for $60,000 (rounded) in costs is not a material part of this appeal.

could raise the issue. Plaintiffs argued that, if public entities like the LRDA could avoid responsibility for violating the law by claiming they could not afford to pay attorneys' fees, the private attorney general statute would become meaningless and enforcement of vital public policies would be impaired. Plaintiffs disputed the LRDA's claim that payment of attorneys' fees would impede the agency's affordable housing obligations. Plaintiffs submitted a declaration from David Nolte, a certified public accountant. Nolte explained that the last audited financial statement from the LRDA revealed a $13.6 million fund balance. Further, the City owed the LRDA $1.2 million.

In its supplemental opposition, the LRDA argued that the language in the settlement agreement about the agency's "financial condition" showed that the parties intended to "go beyond" the factors addressed in *Serrano III, supra,* 20 Cal.3d 25, and to allow the court to include this factor in its determination of the amount of attorneys' fees. Changing its original assertion that it could pay only $160,000, the LRDA proffered that an award of attorneys' fees in excess of $536,000[4] would be made at the expense of low- and moderate-income housing for the City's residents. The LRDA further argued the court should reduce any fee award because the law firms which had worked on the litigation "promote themselves as charitably giving to the community" through their pro bono work. In separately filed papers, the LRDA argued Plaintiffs' lawyers spent over 500 hours on their successful discovery motions, while the LRDA's lawyers had spent 86.5 hours. In a similar vein, the LRDA argued Plaintiffs' lawyers overstaffed and overprepared for depositions.

On July 10, 2009, the court issued a tentative ruling. The court ruled Plaintiffs were the prevailing parties, having "obtained the relief sought in the Complaint through the stipulated judgment." The court also found Plaintiffs' litigation had "conferred a significant public benefit" in that the settlement agreement would result in "the development of almost 100 new affordable housing units and the reimbursement of amounts owed by LRDA to various public funds." In its oral pronouncements, the court expressly noted that, without Plaintiffs' counsel, "we would not have the result we have. We would not get anything." The court expressly stated Plaintiffs' counsel did "a fantastic job" with regard to affordable housing in the City.

Despite its written and oral statements, the court ruled it would measure the amount of attorneys' fees by applying a negative multiplier of 0.2 to the lodestar requested by Plaintiffs. The trial court based its ruling on two predominant grounds: first, the settlement agreement authorized the court to "factor in" the LRDA's financial condition in deciding the amount of fees; second, "the requested attorneys' fees would significantly reduce the amount

---

[4] We have rounded this number for simplicity.

that the [LRDA] has to provide additional low-income housing." In its oral pronouncements at the hearing, the court stated that the LRDA's financial condition "was the most compelling reason for reducing the fees." During the remaining parts of the hearing, the court added these sentiments: "[I]t seems as though the money should be spent in Lynwood and not on the lawyers." "If that were not the case, you would be entitled to more fees in the court's view. I can't see taking money away from the citizens of Lynwood. . . . I just think that money is better directed to the City of Lynwood [sic] in helping those people with the housing."

The court's second reason for applying a negative multiplier was its finding that portions of the attorney time reflected in the billing statements submitted by Plaintiffs' lawyers was "duplicative" and, therefore, "non-compensable." The court did not calculate and deduct specific amounts from the lodestar based on these conclusions, but cited this as a factor for applying a negative multiplier. In addition, the court found that the time billed also reflected work completed by law students who received school credit, and that this time billed "should not be passed through to the [LRDA]." The court also suggested Plaintiffs were seeking "attorney fees for actions taken against the City," which were not related to Plaintiffs' claims against the LRDA. Again, however, the court did not deduct specific amounts from the lodestar based on these conclusions. Basically, the trial court adopted the LRDA's claims regarding unreasonable billing but did not specifically calculate and deduct the excessive fees. Instead, it cited the overbilling element as a basis for applying a blanket negative multiplier.

Finally, the court noted the pro bono nature of the lawyers' work as a factor for applying a negative multiplier: "[T]he Court considers an award of millions of dollars of in attorneys' fees unreasonable and excessive when most of the work . . . by Plaintiffs' counsel was pro bono."

As a result of the 0.2 negative multiplier, the attorneys' fees award in favor of Plaintiffs was reduced from the $2.7 million (rounded) lodestar to $540,000 (rounded). On July 14, 2009, the court adopted its tentative ruling, and on August 14, 2009, the court signed and entered an order on the attorneys' fees motion.

Plaintiffs filed a timely notice of appeal.

## DISCUSSION

Plaintiffs contend the trial court abused its discretion by diverging from the "lodestar" approach normally applied when calculating an attorneys' fees award. We agree.

## I. *The Governing Law*

■ A court assessing attorneys' fees must begin with a lodestar figure based on the time spent and the reasonable hourly rate of each attorney involved in the presentation of the case. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131–1132 [104 Cal.Rptr.2d 377, 17 P.3d 735], discussing *Serrano III, supra*, 20 Cal.3d at pp. 48–49.) The lodestar essentially sets a basic fee for comparable legal services in the community. It may be adjusted by the court in order to "*fix a fee at the fair market value* for the particular action." (*Ketchum, supra*, at p. 1132, italics added.) In short, the court's task is to determine whether the litigation before it involved elements "justifying augmentation [(or diminution)] of the unadorned lodestar in order *to approximate the fair market rate for such services.*" (*Ketchum, supra*, at p. 1132, italics added, discussing *Serrano III, supra*, at p. 49; see also *Serrano v. Unruh* (1982) 32 Cal.3d 621, 635 [186 Cal.Rptr. 754, 652 P.2d 985].) "If there is no reasonable connection between the lodestar figure and the fee . . . awarded, the fee does not conform to the objectives established in *Serrano III*, and may not be upheld." (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 324 [193 Cal.Rptr. 900, 667 P.2d 704].)

In *Serrano III, supra*, 20 Cal.3d 25, a trial court took the following factors into consideration in setting an $800,000 attorneys' fees award to be shared equally by each of the two law firms representing the prevailing plaintiffs: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; (6) the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they [were] employed; and (7) the fact that in the court's view the two law firms . . . had approximately an equal share in the success of the litigation." (*Id.* at p. 49, fn. omitted.) Without expressly discussing any one factor, and without expressly stating that the identified list of factors was mutually inclusive or mutually exclusive, the Supreme Court affirmed the attorneys' fees award, finding no abuse of discretion. (*Id.* at p. 49.)

## II. *The Lodestar Approach Should Have Been Followed*

■ We agree with Plaintiffs the trial court erred by diverging from the lodestar in the current case. The cases on this subject do indeed support the

proposition that a court is permitted to apply a negative multiplier. However, in our view, they also teach that some identified, legally justifiable circumstance must exist in support of a decision to diverge from the lodestar.

For example, in *San Diego Police Officers Assn. v. San Diego Police Department* (1999) 76 Cal.App.4th 19 [90 Cal.Rptr.2d 6] (*San Diego Police Officers*), the Court of Appeal affirmed a 0.2 negative multiplier where the record showed the following circumstances: the plaintiff association "had achieved very limited success; the portion of its writ petition on which it prevailed . . . did not involve complex issues of law; the case did not preclude [the association's] attorneys from working on other matters and did not involve a contingency fee; and the award of fees would ultimately be borne by the taxpayers. . . ." (*Id.* at p. 24.) The court further noted that "[t]he vast majority of [the association's] time and effort was clearly spent on issues upon which the Police Department prevailed." (*Ibid.*)

The facts in the current case are directly opposite to those in the *San Diego Police Officers* case. In the current case, Plaintiffs achieved a significant success. Plaintiffs prevailed in an action made complex by the LRDA's internal incompetence of keeping documents in a disorganized, unaccessible fashion and/or its deliberate obstructionism of its discovery obligations. The case required large and largely avoidable amounts of lawyers' time to overcome the LRDA's lack of basic record keeping, thereby precluding work on other matters. At best, Plaintiffs' current case and the *San Diego Police Officers* case are similar only to the extent that the award of attorneys' fees "would ultimately be borne by the taxpayers." Further, since the LRDA does not actually have the power to tax, this is not as much of a similarity as it might initially appear.[5]

In *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819 [112 Cal.Rptr.2d 284], the Court of Appeal affirmed the application of a negative multiplier where the record showed that the prevailing parties' lawyers did little more than duplicate pleadings filed in related cases. (*Id.* at p. 834.) And in *EnPalm, LLC v. Teitler* (2008) 162 Cal.App.4th 770 [75 Cal.Rptr.3d 902], the Court of Appeal affirmed the application of a negative multiplier where the record showed that the prevailing party's lawyers misrepresented the number of hours worked. (*Id.* at pp. 775–778.) Although the trial court in Plaintiffs' current action voiced some concerns about their lawyers' billings, the record

---

[5] We acknowledge that the LRDA, as a governmental entity reliant on tax increment financing, has some measure of connection to taxpayers. It is not altogether clear to us, however, that the LRDA's burden to pay attorneys' fees to the Plaintiffs will necessarily mean that an additional tax burden will be imposed on taxpayers. What truly appears to be involved in the present case is that the LRDA may have less money in its coffers to spend when it comes time to make discretionary decisions whether to look at particular redevelopment projects.

does not support a conclusion that the types of overreaching involved in *Thayer* or *EnPalm* were involved here. Moreover, as discussed below, the lawyers' billings were not the predominant factor in the trial court's decision to apply a negative multiplier.

■ Turning to that principal issue in the current case, we agree with Plaintiffs that the trial court erred by applying a negative multiplier based on the factor that payment of lodestar attorneys' fees would not be the "better" use of the LRDA's money. As noted above, the Supreme Court in *Serrano III* implicitly approved consideration of a "taxpayer burden" factor in fixing an appropriate figure for an attorneys' fees award. (*Serrano III, supra*, 20 Cal.3d at p. 49.) However, the court was not called upon to expound on issues such as when the taxpayer factor could properly be considered and to what extent the factor could be calculated into the attorneys' fees determination. Indeed, in *Serrano III*, the court affirmed an award against governmental defendants based on a positive multiplier applied to the lodestar. (*Id.* at pp. 48–49.)

We acknowledge that, following *Serrano III*, our state's courts have regularly affirmed attorneys' fees awards against governmental entities based on positive and negative multipliers. However, no case cited in the parties' briefs has affirmed a negative multiplier attorneys' fees award against a governmental agency based on the express factor that it would be "better" for a governmental entity not to pay the lodestar so that the entity's ability to fund its ongoing operations would not be affected. In our view, the absence of history on this subject is not surprising given that the funding of a governmental entity's ongoing operations has little, if any, bearing on the "fair market value" of attorneys' fees for the legal work performed by lawyers who represented a prevailing party in an action against that governmental entity.

■ To guide us, we find most applicable *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359 [33 Cal.Rptr.3d 644] (*Horsford*) and *Schmid v. Lovette* (1984) 154 Cal.App.3d 466 [201 Cal.Rptr. 424] (*Schmid*). In *Horsford*, the Court of Appeal held that it was an abuse of discretion to rely on the public entity status of the defendant to deny a positive multiplier. As the *Horsford* court explained, while *Serrano III* identified taxpayer burden as a proper multiplier factor, this factor should not be applied where a governmental entity "chooses to defend its conduct through lengthy and complex litigation." (*Horsford*, at pp. 400–401.) In short, a trial court is not permitted to use a public entity's status to negate a lodestar that would otherwise be appropriate. (*Ibid.*) In *Schmid*, another Court of Appeal reached a similar conclusion, ruling that the fact that the fee award must be paid from the limited budget of a public entity "does not constitute a special circumstance rendering [a lodestar] fee unjust." (*Schmid, supra*, at p. 476.)

In our view, *Serrano III*, *Horsford* and *Schmid* preclude a rule which awards less than the fair market value of attorneys' fees merely because the case was filed against a government agency. We also see a strong public policy against such a rule. Allowing properly documented attorneys' fees to be cut simply because a losing party is a governmental entity would defeat the purpose of the private attorney general doctrine codified in Code of Civil Procedure section 1021.5 and would also incentivize governmental entities to negligently or deliberately run up a claimant's attorneys' fees, without any concern for consequences.

■ Finally, we agree with Plaintiffs that the "pro bono" status of their attorneys cannot justify the negative multiplier applied to Plaintiffs' request for attorneys' fees. It appears that the trial court, in applying a pro bono discounter factor, was giving special treatment to lawyers who represent a party in public interest litigation. We find that treatment to be unfair to Plaintiffs. Our Supreme Court has held that attorneys' fees may not be reduced because the prevailing plaintiffs are represented by public interest law firms, which do not charge their clients for their services. (*Serrano v. Unruh, supra*, 32 Cal.3d at pp. 640–644.) The reason for such a rule is straightforward: public interest litigation " 'should not have to rely on the charity of counsel . . . .' [Citation.]" (*Id.* at p. 644, fn. 40.) The controlling factor, again, is the fair market value of the legal work which was performed.

In *Serrano III, supra*, 20 Cal.3d at pages 48–49, the Supreme Court indicated that the public or charitable funding of a party's counsel may be considered in fixing an award for attorneys' fees. However, as with its reference to taxpayer burden, the court did not have occasion to explain when or how to apply and weigh this factor. We do not understand *Serrano III* to have approved of negating properly documented attorneys' fees simply because a lawyer took a case pro bono. It is one thing to recognize that hourly rates for legal work on behalf of multinational corporate clients is compensated more handsomely in the marketplace than legal work in other fields, but it is not proper to cut properly documented, field-appropriate fees because a lawyer provided pro bono work. Assuming that representation by nonprofit organizations might impact a decision not to apply a positive multiplier, this does not justify a negative multiplier. Lawyers are, and should be, encouraged to provide pro bono services to the community. We reject the proposition that a law firm's willingness to provide its services on a pro bono basis to low-income clients justifies a diminishment in the fee award when that pro bono representation proves successful. (*Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270, 1278–1279 [66 Cal.Rptr.3d 725].) Economics dictate that if private lawyers know fees will be reduced, even in successful litigation, because the litigation was pro bono, fewer would take on such cases. At the same time, if a government defendant knows it can drag out litigation without consequence where the opposing party's lawyers are pro bono and cannot

collect their full fees, the defendant will have less incentive to cooperate. This would all inure to the detriment of parties who need pro bono counsel and to the court system itself. Finally, we agree with Plaintiffs that permitting a "pro bono discounter" would lead to the anomalous result that the only cases in which fully compensatory fees can be awarded are those in which the prevailing plaintiffs actually have the ability to pay their attorneys.

III. *The Reasonableness of the Attorneys' Fees*

At this point, we decline to address Plaintiffs' contention that the record does not otherwise support the trial court's decision to reduce their lodestar request for attorneys' fees. For the reasons explained above, we agree with Plaintiffs that the record supports a conclusion that the trial court applied a negative multiplier based on the LRDA's status as a governmental entity. On examination of the attorneys' fees issue in the absence of this factor, the trial court may determine that portions of Plaintiffs' claim for attorneys' fees are excessive. For this reason, we find it premature to evaluate any trial court assessment of reasonableness of fees until the court has made specific findings on that issue.

IV. *The Settlement Agreement*

The LRDA contends the trial court properly reduced Plaintiffs' lodestar under the attorneys' fees provision included in the settlement agreement. We disagree.

According to the LRDA, Plaintiffs' appeal "is controlled by the express provisions of the settlement agreement." LRDA argues that the law allows parties to agree, in accord with basic contract principles, to resolve the issue of attorneys' fees in a manner other than under Code of Civil Procedure section 1021.5. We have no quarrel with the LRDA's abstract statement of law allowing for the contractual resolution of the issue of attorneys' fees. However, that does not support the LRDA's argument that the award in the current case must be sustained.

The express language of the settlement agreement provided that "nothing in [the] Settlement Agreement . . . shall preclude the [LRDA] *from raising* its financial condition." (Italics added.) The LRDA tells us that this language "permitted the trial court *to consider* the [LRDA]'s financial condition." (Italics added.) We have reviewed the record before us, including statements made by Plaintiffs' counsel at the final hearing on the attorneys' fees issue on July 10, 2009, and we find the record supports the interpretation of the settlement agreement proffered by the LRDA.

Accepting the LRDA's interpretation of the settlement agreement, however, does not mean we accept its argument that the settlement agreement

compels us to affirm the trial court's attorneys' fees order. The trial court did not make express findings on the LRDA's financial condition, and it did not find that its financial condition precluded it from paying any more than $540,000 in attorneys' fees. The court made no findings on how much money the LRDA has in its coffers, or what it needed to meet expenses, or what size payment would be practicable. On the contrary, the court appears to have made a value judgment that it would be better for money to stay in the LRDA than to go to Plaintiffs' attorneys. On remand, if the court determines the LRDA's financial condition, as shown by evidence of its actual finances, precludes the LRDA from paying a lodestar attorneys' fees award, then the court may consider that as one of the several factors in fixing the amount of fees. We simply rule that the trial court may not cut the lodestar based on a concern that it would be better for the LRDA to keep money which otherwise would go to Plaintiffs' lawyers.

## DISPOSITION

The trial court's order awarding attorneys' fees of August 14, 2009, is reversed, and the cause is remanded to the court with directions to reconsider the proper amount of attorneys' fees to be awarded to Plaintiffs based on their lodestar, and any proper factor in the published cases. Plaintiffs are awarded costs on appeal.

Rubin, J., and Flier, J., concurred.