FILED

01/31/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0639

DA 22-0639

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 19

FORWARD MONTANA; LEO GALLAGHER;
MONTANA ASSOCIATION OF CRIMINAL
DEFENSE LAWYERS; GARY ZADICK,

        Plaintiffs and Appellants,

   v.

THE STATE OF MONTANA, by and through
GREG GIANFORTE, Governor,

        Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. ADV-2021-611
                   Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Raph Graybill, Graybill Law Firm, PC, Great Falls, Montana

                Rylee Sommers-Flanagan, Constance Van Kley, Upper Seven Law,
                Helena, Montana

        For Appellee:

                Austin Knudsen, Montana Attorney General, Brent Mead, Deputy
                Solicitor General, Helena, Montana

                Emily Jones, Special Assistant Attorney General, Jones Law Firm,
                PLLC, Billings, Montana

                            Submitted on Briefs:  November 29, 2023
                                   Decided:  January 31, 2024

Filed:

                       _____
                                      Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Forward Montana, Leo Gallagher, Montana Association of Criminal Defense Lawyers, and Gary Zadick (Appellants) appeal from a September 16, 2022 order of the First Judicial District Court denying attorney fees under the private attorney general doctrine ("Private AG Doctrine" or "the Doctrine") and under the Uniform Declaratory Judgments Act (UDJA), § 27-8-313, MCA. We reverse and remand to the District Court for calculation of attorney fees.

¶2 We restate the issue on appeal as follows:

*Was it an abuse of discretion for the District Court to deny Appellants' attorney fees under the private attorney general doctrine?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 The Montana Legislature passed Senate Bill 319 (SB 319) during the 2021 legislative session. The Bill—originally a regulation of joint political fundraising committees—proceeded normally through the legislative process (introduced in Senate, passed through the Senate Committee on State Administration, passed on the Senate floor, passed as amended through the House Committee on State Administration, passed as amended on the House floor). Each of these steps included a public process, and citizen testimony was provided in both committees. The House passed and transmitted a slightly amended version back to the Senate. The Bill's sponsor recommended the Senate not concur with the amendments so a committee could "review those amendments."

¶4 A free conference committee consisting of members of both houses was appointed. The committee did not discuss the House amendments at all. Instead, on April 27, 2021—

2

two days before the Legislature adjourned—the free conference committee used the opportunity to include four new sections to the Bill during a 17-minute meeting, closed to public comment. Several of these last-minute amendments came almost verbatim from a Bill that had recently failed to pass in the legislative session. *See* S.B. 318, § 4(1)(E)(v), (F), 67th Leg., Reg. Sess. (Mont. 2021) (rejected on House floor April 15, 2021); *compare* S.B. 319.5, § 22, 67th Leg., Reg. Sess. (Mont. 2021) (adopted during last-minute, closed-door session April 27, 2021). The Bill as amended then passed both houses in the last 24 hours of the 2021 legislative session.

¶5    On June 1, 2021, Appellants challenged two of these amendments based on Article V, Section 11(6), of the Montana Constitution, which allows a person to challenge a statute "on the ground of noncompliance with [Section 11] only within two years after its effective date." Among other allegations of unconstitutionality, Appellants challenged Sections 21[1] and 22[2] of SB 319 as violative of two sections of the Montana Constitution: Article V, Sections 11(1) and (3). Article V, Section 11(1), requires that "[a] law shall be passed by bill which shall not be so altered or amended on its passage through the legislature as to change its original purpose." (Rule on Amendments.) Article V, Section 11(3), requires that "[e]ach bill, except general appropriation bills and bills for the codification and general revision of the laws, shall contain only one subject, clearly expressed in its title." (Single Subject Rule.)

---

[1] Section 13-35-242, MCA (2021 Mont. Laws ch. 494, § 21).

[2] Section 3-1-609, MCA (2021 Mont. Laws ch. 494, § 22).

3

¶6 On June 4, 2021, Appellants filed a Verified Amended Complaint and an Application for Preliminary Injunction to preserve the status quo while the merits of the case were heard, as the laws were set to go into effect on July 1, 2021. The Attorney General responded to Appellants' motion for preliminary injunction on June 21, arguing Appellants did not have legal standing to challenge the law, and that they had not satisfied the legal standard for obtaining a preliminary injunction. The District Court held a show-cause hearing on June 28 and granted Appellants' motion on July 1, preliminarily enjoining the enforcement of SB 319, Sections 21 and 22. On August 4, the Attorney General filed a motion to dismiss, arguing again that Appellants did not have standing to challenge the laws and that they had failed to state a claim upon which relief could be granted under M. R. Civ. P. 12(b)(6).

¶7 On August 18, Appellants filed a Motion for Summary Judgment on their claims under Article V, Section 11. Appellants argued there were no genuine disputes of material fact, and they were entitled to judgment as a matter of law. The State filed a motion to stay the decision on Appellants' motion for summary judgment until its motion to dismiss was resolved and until it could conduct discovery into Appellants' claims regarding standing.

¶8 The District Court ruled that Appellants had standing to bring the lawsuit and denied the State's motion to dismiss on October 6. The court further found that additional discovery was unnecessary on the two constitutional claims in Appellants' summary judgment motion and stayed discovery until resolution of that motion. Thereafter, the State responded to Appellants' motion for summary judgment. The State again argued that Appellants lacked standing and that the sections at issue were not unconstitutional. The

4

court held oral argument on the motion for summary judgment on January 25, 2022, and issued its order on February 3.

¶9     The court found that SB 319 contained two subjects unrelated to campaign finance (the original subject of SB 319) because Section 21 banned select campaign activities[3] and had no effect on campaign contributions, spending, or disclosures, and because Section 22

---

[3] Section 21 reads:

> **Political activity in public postsecondary institution residence hall, dining facility, or athletic facility -- prohibition -- exceptions -- penalty.** (1) A political committee may not direct, coordinate, manage, or conduct any voter identification efforts, voter registration drives, signature collection efforts, ballot collection efforts, or voter turnout efforts for a federal, state, local, or school election inside a residence hall, dining facility, or athletic facility operated by a public postsecondary institution.
>
> (2) Nothing in this section may be construed as prohibiting any communications made through mail, telephone, text messages, or electronic mail inside a residence hall, dining facility, or athletic facility or any political advertising made through radio, television, satellite, or internet service. Nothing in this section may be construed as prohibiting an individual from undertaking or participating in any activity for a federal, state, local, or school election if the activity is undertaken at the individual's exclusive initiative.
>
> (3) A person who resides in a residence hall operated by a public postsecondary institution or who regularly uses a dining hall operated by public postsecondary institution, a candidate for office in a federal, state, local, or school election, or a political committee engaged in a federal, state, local, or school election may institute an action in any court of competent jurisdiction to prevent, restrain, or enjoin a violation of this section.
>
> (4) A political committee that violates this section is subject to a civil penalty of $1,000 for each violation. Each day of a continuing violation constitutes a separate offense.
>
> (5) For the purposes of this section, "public postsecondary institution" means:
>
> (a) a unit of the Montana university system as described in 20-25-201; or
>
> (b) a Montana community college defined and organized as provided in 20-15-101.

Section 13-35-242, MCA (2021).

regulated judicial recusal[4] rather than limiting campaign contributions or reporting requirements. It was thus in violation of Article V, Section 11(3), of the Montana Constitution. The court further found that Sections 21 and 22 amended SB 319 to the extent that its original purpose was changed in violation of Article V, Section 11(1), of the Montana Constitution. The court permanently enjoined enforcement of Sections 21 and 22 as violative of Article V, Sections 11(1) and (3), of the Montana Constitution. It then certified its prior judgment as a final judgment subject to immediate appeal.

¶10 In a tacit acknowledgment that the Bill was unconstitutional, the State filed a notice that it was waiving appeal of the District Court's order.[5] The order thus became law. *See Jonas v. Jonas*, 2013 MT 202, ¶ 21, 371 Mont. 113, 308 P.3d 33 ("[A] legal decision made at one stage of litigation which is not appealed when the opportunity to do so exists,

---

[4] Section 22 reads:

> **Judicial conflict of interest -- recusal -- definition.** (1) A judicial officer shall disqualify the judicial officer in a proceeding if:
> (a) the judicial officer has received one or more combined contributions totaling at least one-half of the maximum amount allowable amount under 13-37-216 from a lawyer or party to the proceeding in an election within the previous 6 years; or
> (b) a lawyer or party to the proceeding has made one or more contributions directly or indirectly to a political committee or other entity that engaged in independent expenditures that supported the judicial officer or opposed the judicial officer's opponent in an election within the previous 6 years if the total combined amount of the contributions exceed at least one-half of the maximum amount that would otherwise be allowed under 13-37-216 if the contributions had been made directly to the judicial candidate.
> (2) For the purposes of this section:
> (a) "contribution" has the meaning provided in 13-1-101; and
> (b) "judicial officer" has the meaning provided in 1-1-202.

Section 3-1-609, MCA (2021).

[5] By doing so, the fee ultimately awarded in this opinion will be decreased.

becomes the law of the case for the future course of that litigation." (internal quotation omitted)). Section 13-35-242, MCA (2021), and § 3-1-609, MCA (2021), *repealed* 2023 Mont. Laws ch. 433, § 2, are thus unconstitutional and void.

¶11 Thereafter, Appellants moved for attorney fees under the Private AG Doctrine; § 25-10-711, MCA; and under the UDJA, § 27-8-313, MCA. The District Court declined to award attorney fees. Under the Private AG Doctrine, the court found that Appellants had satisfied all three factors required for attorney fees under *Montanans for the Responsible Use of the School Trust v. State ex rel. Bd. of Land Comm'rs*, 1999 MT 263, ¶¶ 66–67, 296 Mont. 402, 989 P.2d 800 (*Montrust*). Nevertheless, the court considered equity and immunity principles and found that this case was a "garden-variety" constitutional challenge undeserving of attorney fees under the Doctrine. The court also denied fees under § 25-10-711, MCA, finding the Attorney General did not act frivolously or in bad faith in defending the Bill, and under the UDJA, finding this case did not present circumstances making fees equitable. Appellants appealed the court's decision under the Private AG Doctrine and the UDJA but did not appeal the court's decision regarding § 25-10-711, MCA.

**STANDARD OF REVIEW**

¶12 We review de novo a district court's conclusion on whether legal authority exists to support an award of attorney fees. *City of Helena v. Svee*, 2014 MT 311, ¶ 7, 377 Mont. 158, 339 P.3d 32. If legal authority exists, we review for an abuse of discretion the court's order granting or denying fees. *Svee*, ¶ 7. An abuse of discretion exists if the district court

7

acted arbitrarily, without the employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *Montrust*, ¶ 68.

## DISCUSSION

¶13    *Was it an abuse of discretion for the District Court to deny Appellants' attorney fees under the private attorney general doctrine?*

¶14    When it comes to attorney fees, Montana follows the American rule—absent specific statutory or contractual provisions, prevailing parties are generally not entitled to recovery of their attorney fees in prosecuting or defending an action. *W. Tradition P'ship v. Att'y Gen.*, 2012 MT 271, ¶ 9, 367 Mont. 112, 291 P.3d 545. We recognize several equitable exceptions to the American rule, but we construe them narrowly so the exceptions do not swallow the rule. *W. Tradition P'ship*, ¶ 9.

¶15    One of these narrow equitable exceptions to the American rule is the Private AG Doctrine, which we adopted from *Serrano v. Priest*, 569 P.2d 1303 (Cal. 1977). *Montrust*, ¶ 67. The party seeking attorney fees must show three basic equitable considerations under the Doctrine: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [and] (3) the number of people standing to benefit from the decision." *Montrust*, ¶ 66 (quoting *Serrano*, 569 P.2d at 1314). The District Court found that Appellants met all three factors under *Montrust*. However, the court concluded the case was a "'garden-variety' declaratory judgment action," which was not deserving of attorney fees.

8

¶16 We have limited attorney fees under the first factor of the Doctrine to cases vindicating constitutional interests so that courts will not be in the role of assessing public policies better left to the Legislature. *Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2011 MT 51, ¶ 22, 359 Mont. 393, 251 P.3d 131; *See also Serrano*, 569 P.2d at 1314. However, this factor does not require a litigant to bring a direct constitutional challenge. *See Burns v. Cty. of Musselshell*, 2019 MT 291, ¶¶ 14–16, 398 Mont. 140, 454 P.3d 685; *see also Clark Fork Coal. v. Tubbs*, 2017 MT 184, ¶¶ 17–22, 388 Mont. 205, 399 P.3d 295 (comparing cases).

¶17 As discussed below, this factor is satisfied here, where Appellants challenged Sections 21 and 22 purely on constitutional grounds and won summary judgment on their claims under Article V, Section 11, of the Montana Constitution. *See Burns*, ¶ 21 ("It is the vindication of constitutional interests that demonstrates the societal importance of the litigation."). This case falls squarely within the courts' important role in enforcing constitutional checks on the legislative power and implicates other important constitutional rights, such as the right to know. Mont. Const. art. II, §§ 1, 9; Mont. Const. art. VII, § 1.

¶18 The Dissent suggests that even though significant constitutional interests were vindicated in *Western Tradition Partnership*, we held these were not enough under the first factor. *See* Dissent, ¶ 51. However, our holding in *Western Tradition Partnership* recognized that "even though ATP vindicated principles of constitutional magnitude, the State's defense *also was grounded in constitutional principles* and in an effort to enforce interests the executive deemed *equally significant* to its citizens." *W. Tradition P'ship*, ¶ 20 (emphasis added). The important constitutional interests at stake in *Western Tradition*

9

*Partnership* are not in dispute. Our holding shows that both sides had important constitutional interests they were trying to vindicate. Here, however, Appellants alone were vindicating important constitutional interests. The Legislature disregarded its constitutional limitations, and the Attorney General offered no substantive or constitutional interests in defense of these actions.

¶19 Along the same reasoning that underpins our decisions limiting the Doctrine to constitutional interests, we have also discussed that the separation of powers cautions us to avoid interfering with other branches under the first factor. *W. Tradition P'ship*, ¶ 16. For example, in determining if fees under the Doctrine were appropriate in *Western Tradition Partnership*, we held that awarding attorney fees against the Attorney General was improper in a "garden variety" constitutional challenge that the Attorney General had chosen to defend because his arguments were not frivolous or in bad faith. *W. Tradition P'ship*, ¶¶ 17–18, 20. Indeed, because of our reluctance to invade the province of another coequal branch of government, we looked closely at whether the Attorney General defended the law in bad faith. We held that the Attorney General's defense was far from frivolous because five members of this Court were convinced of the argument's merit in a prior decision; both the plaintiff's and the State's arguments were grounded in equally significant constitutional principles; the statute the Attorney General was defending had century-old roots in Montana history; the statute had been enacted by initiative of the people to combat corruption which had entangled state judges and a U.S. Senator from Montana; and the challenge had been brought in a time of shifting legal landscapes given recent U.S. Supreme Court cases. *W. Tradition P'ship*, ¶ 20.

¶20  Here, we do not hold attorney fees are proper because of the Attorney General's defense of the law, which included a challenge to Appellants' standing at different stages of the litigation as well as defenses on the merits of the Bill.  Rather, we conclude that attorney fees are proper in this case because of the process through which the unconstitutional sections of this Bill came to be: an obviously unlawful Bill adopted through willful disregard of constitutional obligations and legislative rules and norms.

¶21  Initially, however, we address the State's argument that statutory immunity requires the denial of fees in this case.  This argument stems from *Finke v. State ex rel. McGrath*, 2003 MT 48, ¶¶ 33–34, 314 Mont. 314, 65 P.3d 576, where we held attorney fees were improper against the defendant counties and State:

> Defendant Yellowstone County advances several arguments against the award of attorneys' fees in this case, but the one we find most persuasive is that *it would be unjust to force the Counties to pay for the unconstitutional actions of the Legislature*.  The award of attorneys' fees, when not statutorily mandated, is within the discreet and inherent equitable powers of the judiciary.  While under the private attorney general doctrine, it may be considered equitable to award attorneys' fees to Finke, we conclude that the inequity of imposing those fees against the Defendant Counties who neither fashioned nor passed the unconstitutional law is overriding.
>
> The only entity remaining against whom fees could be assessed is the State of Montana.  The claim against the State in the case at bar is for injunctive relief against enforcement of SB 242.  *The Plaintiffs did not specifically seek attorneys' fees from the State*, and the claim for injunctive relief simply does not provide a basis for the imposition of attorneys' fees against the State.  In fact, the only potential liability of the State for fees would lie for the actions of the Legislature in enacting an unconstitutional bill, as it is the enactment of SB 242 that prompted the filing of this action.  However, § 2-9-111, MCA, provides that the Legislature, as a governmental entity, is immune from suit for any legislative act or omission by its legislative body.  There is, therefore, no avenue whereby attorneys' fees could be imposed against the State in this matter.

11

(Internal citations omitted and emphasis added.)  The State thus argues that we cannot impose attorney fees when our only finding is that the Legislature enacted an unconstitutional Bill.  This is incorrect for several reasons.  First, the holding of *Finke* as it applied to attorney fees against the State was that plaintiffs had not sought fees against the State and thus could not recover fees from it—everything else was dicta.  *See In re Marriage of Pfeifer*, 1998 MT 228, ¶ 24, 291 Mont. 23, 965 P.2d 895 ("[B]ecause we had resolved the issues before us prior to that [relied upon statement], it is clear that the statement was not necessary to the decision and was, instead, *obiter dictum.*  Consequently, it was not a principle or rule of law necessary to our decision so as to implicate the law of the case.").

¶22     Second, a reading of the statute (§ 2-9-111, MCA) mentioned in *Finke* does not lead to the conclusion that it prohibits attorney fees against the State.  Section 2-9-111(2), MCA, provides that governmental entities (including the State) are "immune from suit" for legislative acts or omissions.  If taken literally, a suit seeking a declaration that a law is unconstitutional or to enjoin its enforcement would be prohibited.  This clearly is not the case.  *See, e.g.*, Mont. Const. art. V, § 11(6); § 27-8-202, MCA (allowing suits concerning the validity of statutes).

¶23     Rather, we have held that § 2-9-111, MCA, immunizes governmental entities from *torts* committed by legislative acts or omissions but not for administrative acts.  *See, e.g.*, *Knight v. Missoula*, 252 Mont. 232, 245, 827 P.2d 1270, 1278 (1992); *Massee v. Thompson*, 2004 MT 121, ¶¶ 77–78, 321 Mont. 210, 90 P.3d 394 (Nelson, J., specially concurring) (collecting cases); *Denke v. Shoemaker*, 2008 MT 418, ¶ 54, 347 Mont. 322,

198 P.3d 284 (explaining that § 2-9-111, MCA, is a narrow exception to Article II, Section 18, of the Montana Constitution, which provides that governmental entities have no immunity from suit for injury to person or property unless specifically provided by law by a two-thirds vote of the Legislature). This reading is consistent with the plain meaning of the statute and the rest of Title 2, Chapter 9, part 1, of the Montana Code. *See* § 2-9-111(5), MCA (specifically exempting some torts from immunity); § 2-9-101(1), MCA (defining "claim" to include suits for money damages for personal injury or property damage arising from "negligent or wrongful act[s] or omission[s]"). Thus, although § 2-9-111, MCA, provides immunity to the State for damages arising in tort caused by legislative acts or omissions, it does not provide immunity against a declaratory judgment action that a law is unconstitutional—or from an equitable grant of attorney fees in that action arising from unconstitutional actions of the Legislature that plaintiffs are forced to litigate.

¶24 Finally, *Finke* cannot stand for the proposition that the State is immune from attorney fees because we have awarded attorney fees against the State in prior cases. *See generally, e.g.*, *Montrust*, *Burns*. The purpose of the Doctrine is to "provide[] an incentive for parties to bring public interest related litigation that might otherwise be too costly to bring." *Sunburst Sch. Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, ¶ 91, 338 Mont. 259, 165 P.3d 1079. If the Doctrine was eliminated where the Legislature has willfully disregarded its constitutional duties and purposefully passed unconstitutional laws, vindicating important constitutional rights through litigation would not be feasible.

¶25 Nevertheless, as we noted in *Western Tradition Partnership*, courts must use caution in awarding fees against the State in "garden variety" constitutional challenges so as not to

13

improperly infringe on the separation of powers. *W. Tradition P'ship*, ¶¶ 16–17. That case discussed attorney fees in relation to the Attorney General's defense of the law and our hesitation to interfere with the executive function of the State. *W. Tradition P'ship*, ¶ 16. We thus looked at whether the Attorney General had defended the law frivolously or in bad faith as a guidepost. *W. Tradition P'ship*, ¶ 18. Here, legislative acts are at issue, and we similarly use caution so as not to interfere with the proper functioning of the legislative branch. We therefore also find it a helpful guidepost[6] to look to the bad faith of the Legislature in enacting unconstitutional laws when deciding whether attorney fees are proper under the Doctrine. *See W. Tradition P'ship*, ¶ 18.

¶26 The Legislature must follow certain rules in enacting legislation to ensure transparency and public participation. Mont. Const. art. V, § 11. The Single Subject Rule is substantially unchanged from Article V, Section 23, of the 1889 Montana Constitution. We stated that the purposes of this section:

> are to restrict the legislature to the enactment of laws the subjects of which are made known to the lawmakers and to the public, to the end that anyone interested may follow intelligently the course of pending bills; to prevent the legislators and the people generally being misled by false or deceptive titles, and to guard against the fraud which might result from incorporating in the body of a bill provisions foreign to its general purpose and concerning which no information is given by the title.

---

[6] This consideration is only a guidepost rather than a requirement. As *Serrano* notes, the concept of the Private AG Doctrine "seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, *regardless of defendants' conduct*, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." *Serrano*, 569 P.2d at 1312 (emphasis added). Thus, fees may be appropriate when a benefit has been conferred on the public even though no showing of bad faith has been made. Further, this is only a guidepost because if bad faith were a requirement under the equitable Doctrine, it would be swallowed up by § 25-10-711, MCA. *Cf. Montrust*, ¶¶ 60–62. Nevertheless, it can be helpful to discuss bad faith in fee requests against the State in order to not unnecessarily interfere with other branches' policy choices. *W. Tradition P'ship*, ¶ 16; *Serrano*, 569 P.2d at 1313.

*State ex rel. Foot v. Burr*, 73 Mont. 586, 588, 238 P. 585, 585 (1925). Similar policies lie behind the Rule on Amendments, which has remained substantially unchanged from Article V, Section 19, of the 1889 Montana Constitution. Undoubtedly the Legislature is aware of these constitutional duties and limitations, especially given these provisions' long history and our holding that if "it is apparent that two or more independent and incongruous subjects are embraced in its provisions, the Act will be held to transgress [Article V, Section 11(3)], and to be void by reason thereof." *Clark Fork Coal. v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 44, ¶ 60, 403 Mont. 225, 481 P.3d 198; *Evers v. Hudson*, 36 Mont. 135, 146, 92 P. 462, 466 (1907).[7]

¶27　The District Court found, and the State does not dispute, that SB 319 was clearly in contravention of the Single Subject Rule. Mont. Const. art. V, § 11(3). Prior to the free conference committee, SB 319 contained only one subject—campaign finance. After the committee meeting, SB 319 contained two additional subjects within Sections 21 and 22—campaign activities in university facilities and judicial recusal.

¶28　In addition, the District Court found that these sections were in violation of the Rule on Amendments, which requires Bills to not be so altered or amended during the legislative process so as to change their original purpose. Mont. Const. art. V, § 11(1). Prior to the free conference committee meeting, the Bill's entire purpose was to revise campaign finance laws regarding the establishment and regulation of joint fundraising committees.

---

[7] *See also Rules of the Montana Legislature*, 67th Leg., 40-90 (Mont. April 2021) (available at https://perma.cc/74EA-TAQG) [hereinafter *Legislature's Rules*] (same as Mont. Const. art. V, § 11(1)).

After the meeting, the original purpose was changed to include regulations on political activities on college campuses and judicial recusal, which is manifestly apparent by examining SB 319's title before and after the committee meeting:

> AN ACT GENERALLY REVISING CAMPAIGN FINANCE LAWS; CREATING JOINT FUNDRAISING COMMITTEES; PROVIDING FOR CERTAIN REPORTING; ESTABLISHING THAT IF STUDENT ORGANIZATIONS THAT ARE REQUIRED TO REGISTER AS POLITICAL COMMITTEES ARE FUNDED THROUGH ADDITIONAL OPTIONAL STUDENT FEES, THOSE FEES MUST BE OPT-IN; PROHIBITING CERTAIN POLITICAL ACTIVITIES IN CERTAIN PLACES OPERATED BY A PUBLIC POSTSECONDARY INSTITUTION; PROVIDING FOR JUDICIAL RECUSALS UNDER CERTAIN CIRCUMSTANCES; PROVIDING PENALTIES; ~~AND~~ AMENDING SECTIONS [enumerated]; AND PROVIDING AN EFFECTIVE DATE.

S.B. 319.5, 67th Leg., Reg. Sess. (Mont. 2021) (underlines and strikethrough in original.) The nonunderlined portions of the title above show SB 319 prior to the free conference committee. SB 319 had 22 sections prior to the committee meeting yet had a relatively short title because it was a comprehensive Bill covering a single subject. By adding four amendments (only two of which are at issue in this case), the committee more than doubled the length of the original title with completely unrelated matters.

¶29 The Dissent contends that these constitutional rights, implicitly tied together with the Montana Constitution's right to know, do not have the "strength or societal importance" of the rights discussed in *Western Tradition Partnership*—free speech. *See* Dissent, ¶ 51. The Dissent thus argues that certain constitutional rights are more important than others. But our caselaw does not require us to assess the strength or societal importance of a constitutional interest and decide whether that interest is as important as other

16

constitutional interests. Rather, we limit evaluation of public policies to those that vindicate constitutional interests instead of balancing public policy concerns left to the Legislative Branch. *Am. Cancer Soc'y v. State*, 2004 MT 376, ¶ 21, 325 Mont. 70, 103 P.3d 1085; *Bitterroot*, ¶ 22; *Montrust*, ¶ 66; *W. Tradition P'ship*, ¶ 14. Similarly, *Serrano*, after discussing that it would be inappropriate to make a judicial evaluation of the strength or importance of statutorily based public policies, held that those difficulties were not present in a case where the public policy was "one grounded in the *state Constitution*." *Serrano*, 569 P.2d at 1314–15 (emphasis in original). Thus, we have limited the first factor to those cases that vindicate constitutional interests. *W. Tradition P'ship*, ¶ 14. The Dissent misreads *Western Tradition Partnership* to mean that a case must present some constitutional interests that are more important than others—that are not "garden variety"—to justify fees. Instead, as discussed above, *Western Tradition Partnership* holds that fees are not justified against the State when the only basis for them is the Attorney General's good-faith defense of the constitutionality of a statute. *W. Tradition P'ship*, ¶ 17. Even if the Attorney General mounts a good-faith defense to a constitutional challenge, fees can still be awarded against the State based on other factors, such as those found in *Montrust* and here. *W. Tradition P'ship*, ¶ 19. But even if the Dissent were correct, the constitutional policies vindicated here—to restrict legislative enactments to those made known to lawmakers and the public, to prevent legislators and the people from being misled, and to guard against obfuscation by the Legislature—are sufficiently weighty to justify fees. *See Foot*, 73 Mont. at 588, 238 P. at 585.

¶30　In addition to the constitutional requirements, the Legislature disregarded its own internal rules that prohibit the actions it took with respect to SB 319. When the House and Senate pass different versions of the same Bill and do not accept the other chamber's amendments, the House and Senate may appoint a conference committee to resolve the differences—confined to accepting, rejecting, or amending only the disputed amendments. *See Legislature's Rules*, 30-30(1)–(2). If the conference committee is unable to reconcile the amendments, leaders may appoint a free conference committee which is able to "discuss and propose amendments to a bill in its entirety and is not confined to a particular amendment. *However, a free conference committee is limited to consideration of amendments that are within the scope of the title of the introduced bill.*" *Legislature's Rules*, 30-30(3)(a) (emphasis added).

¶31　Here, the Legislature went directly to a free conference committee without appointing a conference committee to discuss the amendments. Incredibly, during the 17-minute committee meeting, the committee did not discuss the "disputed" amendments. Rather, the free conference committee proposed unconstitutional amendments that were clearly outside the scope of the title of the introduced Bill.

¶32　The committee—consisting of legislators with more than 42 years of Montana state legislative experience between them—allowed no public participation or testimony, nor did they provide any public notice of the intended changes. Significantly, the amendments consisted of provisions that had already been defeated in other Bills during the legislative session—with one of them having failed mere days before the free conference committee. Such practice clearly violates Legislative Rules. *See Legislature's Rules*, 40-70(1) ("A bill

18

may not be introduced or received in a house after that house, during that session, has finally rejected a bill designed to accomplish the same purpose . . . ."); *see also Legislature's Rules*, 40-90 (same as Mont. Const. art. V, § 11(1)); *Legislature's Rules*, 60-05 (precedent of legislative rules).

¶33 We are not intruding on the Legislature or enforcing its own internal rules as the Dissent suggests. *See* Dissent, ¶ 54. Rather, we use these examples to amplify the fact that the Legislature was well aware that what they were doing was unconstitutional, which serves as a strong showing of bad faith, a factor we consider as a guidepost in determining that fees are proper here. We thoroughly examine this point to show the proper "caution to avoid interference with the [legislative] function." *W. Tradition P'ship*, ¶ 16.

¶34 The first factor of *Montrust* is clearly met. Appellants vindicated important constitutional rights, and our typical judicial restraint from interference with the proper functioning of other branches of government was overcome by the unconstitutional actions and willful disregard of legislative standards in adopting these Sections.

¶35 However, even when important constitutional interests are vindicated by the litigation, we still look at the necessity for private enforcement and the magnitude of the burden on the plaintiff under the second factor. *Montrust*, ¶ 66. As such, we consider whether invoking the Doctrine provides an incentive for parties to bring public interest litigation that might otherwise be too costly to bring. *Sunburst*, ¶ 91. Thus, when litigants are motivated primarily by their own interests and only coincidentally protect the public interest, attorney fees are inappropriate—such as where the litigation results in a monetary judgment for plaintiffs. *Sunburst*, ¶ 91.

¶36 The Doctrine is applicable where private litigants must litigate because "the government, for some reason, fails to properly enforce interests which are significant to its citizens." *Bitterroot*, ¶ 27 (internal quotation omitted); *Burns*, ¶ 13. Thus, we generally do not apply the Doctrine when a government agency represents a public interest and complies with its duties. *In re Dearborn Drainage Area*, 240 Mont. 39, 43, 782 P.2d 898, 900 (1989). However, we awarded attorney fees in *Bitterroot* where, although a government agency was involved in the litigation, the agency did not appeal an adverse decision and—against its objection—was joined as an involuntary party to other parts of the litigation. *Bitterroot*, ¶ 32. Because the agency's involvement "was hardly the usual effort" of an agency seeking to enforce the law, private parties were forced to bear the brunt of the litigation burden and full relief would not have been granted without their effort. *Bitterroot*, ¶ 32.

¶37 The State does not dispute that Appellants bore a large burden in litigating the constitutionality of Sections 21 and 22.[8] Instead, it argues that Lewis and Clark County is

---

[8] The Dissent quotes this sentence and then compares *Western Tradition Partnership*, which admittedly was a much more difficult and drawn-out case than here, for its argument that Appellants have not hit a threshold burden requirement to get fees under the second factor. *See* Dissent, ¶¶ 46–50. The problem with this reasoning is that Appellees did not make any of these arguments to the District Court below or in briefing to us. The District Court said "[t]he State does not argue Plaintiffs did not bear the financial burden of litigating this constitutional issue," and we reiterate in our holding that the State does not dispute this part of the second factor under the Doctrine. Instead, the State argues that private enforcement was not necessary because of the participation of a prior public official in the case. "It has long been the rule of this Court that on appeal we will not put a District Court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which appellant made no objection." *State v. Gardner*, 2003 MT 338, ¶ 44, 318 Mont. 436, 80 P.3d 1262 (internal quotation omitted); *see also State v. Kearney*, 2005 MT 171, ¶ 16, 327 Mont. 485, 115 P.3d 214 ("This Court will not consider unsupported arguments, locate authorities or formulate arguments for a party in support of positions taken on appeal." (internal quotation omitted)). Further, we note that Appellants seek

one of the Appellants, and therefore a government agency is litigating this matter. The State's argument is that since Leo Gallagher (one of the Appellants in this case) was Lewis and Clark County Attorney, the Court should conclude his participation is on behalf of Lewis and Clark County and therefore there was no need for private enforcement.

¶38 This argument misconstrues Gallagher's role in the case. Gallagher sued as a private citizen who will be negatively affected by the recusal requirements of Section 22 in both his public and private work (now or in the future). If the State's argument was correct, our caption would read "Lewis and Clark County, by and through its County Attorney," rather than "Leo Gallagher." *See, e.g.*, *Crites v. Lewis & Clark Cty.*, 2019 MT 161, 396 Mont. 336, 444 P.3d 1025. Gallagher verified the complaint personally and not on behalf of the County. If he had participated on behalf of the County, he would have had to state as such. *See* § 25-4-203, MCA. The verification stated "I, *Leo Gallagher*, being first duly sworn, upon oath depose and say: 1. *I* am Plaintiff in the action set forth above," and it was signed by him personally, not on behalf of the County or in his role as county attorney. (Emphasis added.) Although Section 22 would affect Gallagher in the cases he litigates on behalf of the County, it would equally impact him, and other Appellants, in any cases they litigate in private practice. Thus, Section 22 will affect Gallagher no matter what job he holds, and he personally sued to prevent that.

---

compensation for 335.78 hours worked on the case, totaling $105,119. While we make no comment on the number of hours or the hourly rate that is appropriate for the District Court to award on remand, there can be no doubt that even though this case was resolved on summary judgment, the fees sought show that such public interest litigation vindicating important constitutional interests is far from feasible, which is a main purpose of the Doctrine. *See Serrano*, 569 P.2d at 1313–14.

¶39 Additionally, the complaint shows that Gallagher, in his personal capacity, has contributed to judicial races in the past six years "[c]onsistent with *his* First Amendment rights and commitment to civic life in Montana." (Emphasis added.) Clearly Gallagher was suing on behalf of his own constitutional rights. It would be illegal for Lewis and Clark County to contribute to a candidate. Section 13-35-227(1), MCA. The District Court did not abuse its discretion.

¶40 Since the only governmental entity involved in this case was defending the statute, private enforcement was necessary. *See Serrano*, 569 P.2d at 1313 ("Although there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement, for various reasons the burden of enforcement is not always adequately carried by those offices and institutions, rendering some sort of private action imperative."). The second factor of *Montrust* is met.

¶41 Finally, although we have not set a threshold number of people benefiting from the decision to support attorney fees under the Doctrine, clearly issues of statewide importance are sufficient to pass muster under the third factor. *Bitterroot*, ¶ 34; *see also Burns*, ¶ 23 (concluding an issue that would benefit all Musselshell County voters was sufficient to meet the third factor). The State conceded this factor was met at the District Court because the litigation involves a challenge enforcing important constitutional restraints affecting all Montanans.

## CONCLUSION

¶42 We affirm that all three of the *Montrust* factors support an award of attorney fees in this case under the Private AG Doctrine. However, for the reasons stated herein we conclude that the District Court's finding that this case presented equitable considerations which did not warrant attorney fees under the private attorney general doctrine was unreasonable under these facts and as such an abuse of discretion. Because we conclude fees are warranted under the Doctrine, we do not reach the parties' arguments under the UDJA.

¶43 We decline to award attorney fees on appeal.

¶44 Reversed and remanded to the District Court for consideration of attorney fees.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

Justice Jim Rice, dissenting.

¶45 In my view, the Court's reasoning regarding application of the private attorney general doctrine (Doctrine) lacks merit under our precedent. I would conclude the District Court did not abuse its discretion by denying fees under the Doctrine, which is to be "invoked sparingly," *Western Tradition P'ship v. AG of Mont.*, 2012 MT 271, ¶ 13, 367 Mont. 112, 291 P.3d 545 (*Western Tradition II*), and affirm.

23

¶46 The Court reasons that Appellants "bore a large burden in litigating the constitutionality" of SB 319. Opinion, ¶ 37. The burden of litigation borne here versus the burden borne by the Plaintiffs in *Western Tradition*, which challenged § 13-35-227(1), MCA, part of the original Corrupt Practices Act (Act), counsels otherwise. Here, the Plaintiffs filed suit on June 1, 2021, filed application for a preliminary injunction on June 4, and moved for summary judgment by August 18, 2021, six weeks later. The Attorney General, acting to defend the bill, limited his defense to the issue of standing. When the District Court entered summary judgment in favor of Plaintiffs, the Attorney General "folded his hand" and gave notice he would not appeal from the judgment, conceding the matter. The Attorney General thus acted prudently, in a manner that fulfilled his duty to defend the challenged bill but which also did not unreasonably prolong the matter by engaging in protracted litigation. The case was over.

¶47 In contrast, in *Western Tradition*, after likewise receiving an adverse summary judgment ruling, in which the District Court, quoting *Minnesota Chamber of Commerce v. Gaertner*, 710 F. Supp. 2d 868 (D. Minn. 2010), described the governing precedent from the U.S. Supreme Court, as "unequivocal,"[1] the Attorney General rejected this "unequivocal" determination and extended the litigation by appealing to this Court. While the nature of the interest at issue and the public import are discussed below, *Western Tradition* involved free speech under the First Amendment, an issue which attracted much

---

[1] *See Western Tradition P'ship v. AG*, 2011 MT 328, ¶ 8, 363 Mont. 220, 271 P.3d 1 (*Western Tradition I*), quoting the District Court ("*Citizens United* is unequivocal: the government may not prohibit independent and indirect corporate expenditures on political speech.").

24

public interest that necessarily complicated advocacy in the case. Leave to file amicus briefs was sought and briefs were filed by The ACLU of Montana Foundation, The Montana Trial Lawyers Association, Former Montana Supreme Court Justices William Hunt, William Leaphart, James Regnier, Terry Trieweiler, and John Warner, Montana Public Interest Research Group, The Peoples Power League, Montana Conservation Voters, Montanans for Corporate Accountability, Montana League of Rural Voters, Free Speech for People, Novak Inc., d/b/a Mike's Thriftway, The American Independent Business Alliance, The American Sustainable Business Council, Domini Social Investments, LLC, Trillium Asset Management Corporation, Newground Social Investment, Interfaith Center on Corporate Responsibility, Harrington Investments, Inc., Loring, Wolcott & Coolidge Sustainability Group, Calvert Asset Management Company, Inc., The Christopher Reynolds Foundation, Inc., Walden Asset Management, and the Center for Competitive Politics. *Pro hac vice* and student practice motions were granted. In contrast, there was no amici or outside involvement in *Forward Montana*.

¶48 During the appeal, the *Western Tradition* Plaintiffs were required to litigate appellate procedural issues before this Court, including the Attorney General's motion to strike its reply brief. Following receipt of the party and amicus briefs, this Court set the case for oral argument, in which counsel for Plaintiffs appeared and argued. Several months later, this Court issued the decision, its collective opinions totaling 80 pages, including vigorous dissents to the Court's divided holding. The Dissenters would be proven to be entirely correct that the Court's decision was clearly and predicably wrong. *See Western Tradition I*, ¶¶ 49, 50 (Baker, J., dissenting) ("*Citizens United* holds

25

unequivocally that '[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.'"); ("In my view, the State of Montana made no more compelling a case than that painstakingly presented in the 90-page dissenting opinion of Justice Stevens and emphatically rejected by the majority in o*Citizens United*. Though I believe *Citizens United* requires us to affirm the District Court, we must in any event anticipate the consequences should the Court's holding today be reversed."); *see also Western Tradition I*, ¶¶ 62, 73 (Nelson, J., dissenting) ("The [U.S.] Supreme Court could not have been more clear in *Citizens United* . . . . This Court is simply wrong in its refusal to affirm the District Court.  Like it or not, *Citizens United* is the law of the land as regards corporate political speech.").

¶49    This Court's erroneous decision in *Western Tradition I*, in which the undersigned concurred, forced the Plaintiffs to continue the litigation yet further by preparing and filing a petition for certiorari seeking review by the U.S. Supreme Court.  Plaintiffs moved for a stay of this Court's decision pending appeal, and briefed the issue, but this Court denied the request.  Plaintiffs were then required to seek a stay of this Court's decision from the U.S. Supreme Court, which granted the stay.  Regarding the Attorney General's position in defense of the Act, the Supreme Court declared "there can no serious doubt" that *Citizens United* applied and invalidated the Act, reversing this Court's decision.  *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 516, 132 S. Ct. 2490, 2491.[2]

---

[2] During the course of the litigation, Western Tradition Partnership changed its name to American Tradition Partnership.  *See Western Tradition I*, ¶ 9.

¶50    There is no need to say more—*that* is a heavy litigation burden.  With all due respect to the fine lawyering on behalf of the Plaintiffs here in *Forward Montana*, this case was a cakewalk compared to *Western Tradition*, and the Court's reliance on the heavy burden here provides no shelter from the precedent of *Western Tradition's* denial of fees in a much more difficult case.  This consideration should weigh in favor of the District Court's denial of fees.  In retrospect, our inference in *Western Tradition II* that the case was "garden variety" litigation should be considered as suspect as our merits decision in *Western Tradition I*.  Regardless, at a minimum, it is irrefutable that Western Tradition's burden of litigation, including before the U.S. Supreme Court, far exceeded Forward Montana's summary judgment litigation here.  *See Western Tradition II*, ¶ 37 (Nelson, J., dissenting) (". . . the undisputed result was that ATP had to incur the burden of litigating its rights— not only in the District Court, but also in appeals to this Court and the Supreme Court— against arguments that 'either were already rejected in Citizens United, or fail to meaningfully distinguish that case.' *Am. Tradition*, 132 S. Ct. at 2491.  In my view, given these facts, the magnitude of the burden [of litigation] was great.").

¶51    Next, the Court engages in a perfunctory analysis of the Doctrine's constitutional vindication factor and concludes in a few sentences that because the Plaintiffs here sought relief "purely on constitutional grounds," the factor is easily satisfied.  Opinion, ¶ 17.  This simplistic assessment will weigh in favor of fees for virtually any constitutionally related challenge, and thereby undermine the intended narrowness of the Doctrine's exception to the American Rule.  This factor is supposed to assess "the strength or societal importance of the public policy vindicated by the litigation."  *Montanans for the Responsible Use of*

*the Sch. Tr. v. State ex rel. Bd. of Land Comm'rs* (*Montrust*), 1999 MT 263, ¶ 66, 296 Mont. 402, 989 P.2d 800.  Thus, the broader nature of the litigation is important and requires assessment of societal impact, although courts are to do so without approval or disapproval of the public policies advanced by the litigation, to guard against violating separation of powers.  *See Western Tradition II*, ¶ 16.  The list of amici in *Western Tradition*, provided above, also serves to demonstrate the advanced public interest and importance of the constitutional right that was at issue—free speech.  As the District Court in *Western Tradition* reasoned on the fee issue, "the issues here are very important and are grounded in the United States Constitution."  Although the *Citizens United* and *Western Tradition* cases are often pigeon-holed as "corporate speech" cases, they affected a broader set of rights, going back to cases decided long before *Citizens United*:

> *Citizens United* was not just about the rights of *corporations* and *associations* to speak.  More importantly, it was about the rights of *citizens* to hear and obtain information about candidates from diverse sources without governmental censorship.  Indeed, the *Citizens United* decision rested on two propositions: first, that expenditures (by a person or an organization) on political communication are a form of 'speech'; and second, that 'citizens [have the right] to inquire, *to hear*, to speak, and to use information to reach consensus.'  *Citizens United*, 130 S. Ct. at 898 (emphasis added).  These propositions were not created in *Citizens United*.  Rather, they can be traced to *Buckley v. Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976) (per curiam), and *First Natl. Bank v. Bellotti*, 435 U.S. 765, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978).

*Western Tradition II*, ¶ 42 (Nelson, J., dissenting) (emphasis in original).  "As a matter of federal constitutional law, *all* Montana citizens—at least, every voter in Montana— benefitted from the District Court's decision in favor of ATP under *Citizens United*."  *Western Tradition II*, ¶ 45 (Nelson, J., dissenting) (emphasis in original); *see also Western*

28

*Tradition II*, ¶ 16 ("The constitutional principles underlying this litigation cannot be doubted."). The Court concludes that, despite our determination in *Western Tradition II*, the significant constitutional vindication at work there did not tip the scales in favor of fees, the factor is nonetheless "easily met" here. In my view, this conclusion is an incorrect application of the factor and irreconcilable with *Western Tradition II*. The constitutional interests vindicated in *Western Tradition* served a far greater societal purpose than the issue here, evidenced both by public interest and an analysis of the constitutional history of the rights vindicated in *Western Tradition*. This factor should also weigh against fees.[3]

¶52 Perhaps because support here is weak under our precedent, the Court utilizes new standards to justify fees: that fees should be awarded because SB 319 is "obviously" unconstitutional, and that fees under the Doctrine should be awarded for the punitive purpose of punishing the Legislature for "willful disregard" of legislative "rules and norms." Opinion, ¶ 20. Beyond the fact that our precedent provides no support for such considerations in application of the Doctrine, I disagree with the use of these standards for several other reasons.

¶53 First, the law provides no gradations of unconstitutionality, nor should we create them. A law is either constitutional or not. The Court's holding here encourages future parties to argue that the law they challenge is "really" unconstitutional, and for that reason alone, such vague considerations should not be employed. However, if it is fair to

---

[3] The broad societal impact of the *Western Tradition* litigation thus also provided support for the Doctrine's factor of "the number of people standing to benefit from the decision," *Montrust*, ¶ 66, but we did not conclude that factor tipped the balance in favor of fees.

colloquially refer to a law as "clearly" or "obviously" unconstitutional, then such could clearly be said about the Corrupt Practices Act after *Citizens United* was decided. Although, for our Court, that point was only clear in hindsight, a retrospective demonstrates the Act's unconstitutionality was never in doubt after *Citizens United*. In striking down the statute, the District Court correctly described *Citizens United* as "unequivocal," as did the Dissenters in *Western Tradition I*. The U.S. Supreme Court upheld these perspectives by summarily reversing this Court's decision, without even requiring briefing on the merits of the issue. *See Western Tradition II*, ¶ 37 (Nelson, J., dissenting) (". . . despite the clarity and breadth of the *Citizens United* decision, the Attorney General took the position that Montana's ban on independent expenditures is constitutional and enforceable."). By any measure, this turn of events demonstrated "obvious" unconstitutionality of the Act. Yet, this Court, despite having the benefit of this hindsight at the time we decided *Western Tradition II*, did not consider this "obvious" unconstitutionality of the Act to weigh in favor of fees under the Doctrine, despite the Dissent making that very point. To be consistent, nor should we here.

¶54 Secondly, the Court is using the Doctrine as a sword to punish the Legislature, to deter it from "wrongdoing," based in part on what I view as the Court's revulsion at legislative "sausage-making." This is an inappropriate judicial consideration. The judiciary has no business intruding into the internal operation of another branch of government, except as the Constitution expressly permits it. The District Court properly stayed within constitutional contours in its summary judgment ruling. *See Order on Motion for Summary Judgment*, ADV-2021-611, p. 9 ("the Court concludes SB 319

30

contains two subjects not related to campaign finance, in violation of the single subject rule embodied in the Montana Constitution, Article V, § 11(3). The Court further concludes SB 319 was amended in passage through the legislature to an extent the bill's original purpose was changed, in violation of the Montana Constitution, Article V, § 11(1)."). However, in contrast, the Court veers off the constitutional pathway, indicting the Legislature's procedural use of a free conference committee, the timing of legislative amendments ("two days before the Legislature adjourned"), the use of prior bills as source material for the challenged amendments ("[s]ignicantly, the amendments consisted of provisions that had already been defeated in other Bills during the legislative session— with one of them having failed mere days before the free conference committee"), the length of a committee meeting (a "17-minute committee meeting"), a disregard for "[the Legislature's] own internal rules," a failure to follow "legislative rules and norms," and that such behavior was from "legislators with more than 42 years of Montana state legislative experience between them." While such aspects of the legislative process may be mortifying to some, I find nothing unusual here. More to the point, none of these are constitutional violations. What violates the Constitution is the Court's use of these things in its reasoning. The Legislature is free to violate its "internal rules" or "legislative norms" all day long, blatantly or otherwise, and it is none of this Court's concern unless a constitutional provision has been violated. There are no constitutional prohibitions on legislators making decisions at the last minute, and I completely disagree that it is legally "significant" that prior bills were used as sources for amendments—even bills that failed "mere days" before. There is no prohibition against legislators engaging in behaviors that

they have enough experience to avoid, or against conducting a 17-minute meeting. Indeed, it could just as well have been a five-minute meeting. As we have explained, where the shoe was on the other foot, and we resisted the Legislature's effort to control the judiciary's internal operations:

> The totality of the effect of [the challenged statute] is to interfere with the internal operations of the judiciary *in the same manner as if the judiciary would impose limitations on the legislature as to its internal operations, such as* the number of committees, the time within which a committee must act, the time each legislator must attend the sessions, limiting the time of discussion, limiting the time one bill must pass from one house to the other and the like. All of these legislative functions are internal with the legislature and the constitution authorizing the legislature to govern its affairs without interference from the other constitutional branches of government.

*Coate v. Omholt*, 203 Mont. 488, 498, 662 P.2d 591, 596-597 (1983) (emphasis added). In my view, the use of "legislative norm" violations, including the Court's repeated citation to internal legislative rules, Opinion, ¶¶ 28-29, to establish wrongdoing, is an inappropriate intrusion into another branch and sets a troubling precedent. It is only the requirements of the Constitution we are to be concerned about. More broadly, the Court's use of the Doctrine as a measure to punish the Legislature is a drastic departure from the purpose of the Doctrine as established in our precedent.[4]

---

[4] In response to this Dissent, the Court has partially backed away from its position that fees are here justified by the need to punish legislative wrongdoing for enacting an obviously or blatantly unconstitutional bill, and instead reasons that fees are necessary to protect the public's right to know. Opinion, ¶¶ 17, 29. However, SB 319 was not declared to be unconstitutional for violation of the right to know, but of containing two subjects not related to campaign finance in violation of the single subject rule, a violation of Article V, § 11(3), and for being amended in passage to an extent that the bill's original purpose was changed, a violation of Article V, § 11(1).

¶55 The Court does not fault the Attorney General for defending SB 319. I agree and find the Attorney General's action here to be measured and reasonable, including waiving the right to appeal and bringing the litigation to a close after the District Court's adverse ruling. Attorney fees are not warranted under § 25-10-711(1), MCA, which, while not dispositive, we have explained "serves as a guidepost in analyzing a claim for fees under the private attorney general doctrine." *Western Tradition II*, ¶ 18.

¶56 The equitable nature of the Doctrine makes it critical that courts ensure it is not applied through a lens of judicial endorsement of the litigation, that is, granting fees where a court favors a plaintiff's constitutional objectives, while rejecting fees where a court disfavors a plaintiff's constitutional objectives. Justice demands that all parties receive equal treatment under the Doctrine. In my view, application of the Doctrine's factors, as discussed herein, clearly demonstrates that *Western Tradition* presented a far more appropriate case for an award of fees than the case made here, and that this case is the more "garden variety" constitutional litigation that does not satisfy our precedent for an award of fees. Given that precedent, and the need for fairness, I would conclude the District Court did not abuse its discretion by denying them here.

/S/ JIM RICE

Justice Dirk Sandefur joins in the dissenting Opinion of Justice Rice.

/S/ DIRK M. SANDEFUR

33